THE PEOPLE v. NATHAN J. AIKIN.

*Manslaughter—Abortion—Pleading—Joinder of counts—Evidence—*
*Statements of deceased—Expert testimony—Circumstantial*
*evidence—Reasonable doubt—Conduct of prose-*
*cutor—Duty of court.*

1. Respondent was charged in the complaint and warrant with man-
slaughter under How. Stat. § 9527, and informed against under
How. Stat. § 9107, for manslaughter by the administration of
drugs and medicines, and by the use of an instrument.

  *Held,* that a motion to quash the information, on the ground
  that the offenses charged therein were not those named in the
  complaint and warrant, was properly denied, the question
  raised being settled under the rulings of this Court. *People v.
  Sweeney,* 55 Mich. 586; *People v. Sessions,* 58 Id. 594; *People v.
  McDowell,* 63 Id. 229.

2. In such a case a *fourth* count charged the respondent with man-
slaughter by reason of his criminal neglect as a man midwife, to
whom the care of the deceased had been committed, resulting
in her death.

  *Held,* that the offense charged is not contained within that
  charged in the *first* count, and in the complaint and warrant, as
  a lesser crime within a greater; nor does the *fourth* count come
  within the statute upon which the *second* and *third* counts are
  based, nor can it be considered as charging in *any manner* the
  crime of manslaughter by an attempt to produce an abortion,
  or by an abortion ; and a general verdict of guilty under the
  *three* counts cannot be sustained.

3. An information for manslaughter under How. Stat. § 9527, can
only be used in cases where the *killing* resulted *directly* from
*acts of violence.*

4. The true and only just rule governing the joinder of counts in an
information or indictment seems to be, if the different counts
are drawn and used with a view to one and the same transaction,
so that one of them, upon the trial, may be found to meet the
evidence, the court will not interfere with the proceeding, as
such an object is a legitimate one. But when the object and
purpose is apparent to prosecute the respondent, and such is the
logical effect, for *separate* felonies by means of *one* information
or indictment, the court will not permit it to be done, as the in-
justice and prejudice to the accused overbalance all possible

benefits to be derived to the public from such a practice. [See authorities cited in opinion, at pages 470-71.]

5. On a trial for manslaughter caused by an alleged abortion, the people introduced the evidence of the physicians who held the *post mortem*, which tended to show that the death of the girl was produced by abortion, and then called as a witness the woman at whose house the girl was cared for during her sickness, who was allowed to give in detail the story of such sickness, the attendance received and medicines taken, the delivery of the child, and all the subsequent events as they took place up to the hour of her death.

*Held*, that the testimony was properly received as tending to show that the death of the girl was produced by an abortion, to which end it was competent to show her illness from its commencement, and how she came to be at the house where she died ; that the *corpus delicti* was not only to be established by the *post mortem*, but also by the fact of the girl's pregnancy, her illness, her treatment and by whom, and her condition generally up to the time of her death ; and that what the respondent *did* and *said* in connection with such illness while in the house attending upon the deceased was properly a part and parcel of such history.

6. On the trial of a physician for an alleged abortion, a witness was allowed to testify to statements made by the deceased after the birth of the child, regarding certain medicine which she claimed the respondent had induced her to take, and which the witness testified he took away two days and a night previous to the making of such statements; and on the argument of the case to the jury the prosecutor claimed that such statements established the *fact* that the abortion was produced by said medicine, administered prior to its removal, by the respondent. The statements were not claimed to be admissible as "dying declarations," and they were not part of the *res gestæ*.

*Held*, that anything the girl said during her illness, as to her *present* pain or suffering, was admissible to show her *present* condition, and her symptoms at the time of making such statements; but that her narration of what the respondent had said or done a day or days previous was purely hearsay, and not admissible under any exception to the general rule excluding such testimony.

7. An expert can never be safely permitted to state that he has *read* or *heard* the testimony of a witness, and then base his opinion upon such testimony, without stating the *particular* points of the evidence—the facts—upon which he rests his conclusion; but he may be asked, on cross-examination, to state how he differs from what was said by a physician who had been sworn as an expert

in the case, for such inquiry calls for a statement of what was said by such witness, and his reasons for differing from him in opinion.

8. Counts for manslaughter by the administration of drugs and medicines, and by the use of an instrument, which relate to the same transaction, are properly joined in an information under How. Stat. § 9107.

9. There can be nothing gained in the end by an overzealous and unfair perversion of facts to convict an accused person of a crime of which the prosecutor may have good reason to believe him guilty, but which may be hard to establish by the ordinary and established methods of procedure. While the zeal of the prosecutor may be excused, and the hot and bitter language that comes from the heart, involuntarily, of one who is thoroughly impressed with the heinousness of the crime, and the guilt of the respondent, is to be expected in such cases, it is nevertheless the duty of the court, sitting impartially between the people and the prisoner, to check and control any intemperance of zeal or language not warranted by the facts and circumstances shown by the proofs. If this is not done, the final court of review, removed entirely from the passion and the prejudice that generally surround the trial in the lower courts of cases of this nature, will see to it that the injustice is corrected, and a new trial granted.

10. It has always been held, in cases of purely circumstantial evidence, that if any of the facts or circumstances established be *absolutely* inconsistent with the hypothesis of guilt, that hypothesis cannot be true.

11. The verdict of a jury in a criminal case resting upon circumstantial evidence is built upon a series of facts connected logically together, and succeeding each other in a certain order, one resting or depending upon another as a result of the proceeding; and each necessary link, and each and every material and necessary fact upon which a conviction depends, and without which the chain of evidence is broken, must be established *beyond a reasonable doubt* to warrant a conviction.

Exceptions before judgment from the superior court of Grand Rapids. (Parrish, J.) Argued April 27, 1887. Decided June 23, 1887.

Information for manslaughter. Respondent convicted. Reversed, and new trial granted. The facts are stated in the opinion.

*L. A. Ward* (*N. E. Earle,* of counsel), for respondent.
*Moses Taggart,* Attorney General, for the People.

MORSE, J. Mary Noel, the daughter of John Noel, a
farmer residing a few miles out of the city of Grand Rapids,
became intimate with a young man by the name of Hamil-
ton, and from such intimacy her pregnancy resulted. Some
time in January or February, 1886, her condition was dis-
covered by her family. Hamilton refused to marry the girl,
and measures were taken to conceal her pregnancy from the
world at large. One Dr. Weston, the family physician, was
consulted, and finally it was thought best by all concerned
to let nature take its course. It was agreed by the girl, her
family, and young Hamilton that a lying-in place should be
secured in Grand Rapids as private as possible, and that she
should be put under the care of a reputable physician in that
city, who should attend her in her sickness and confinement.
Hamilton, who was studying medicine, undertook to engage
such physician. He called upon the respondent, who had
been practicing his profession for many years in the city of
Grand Rapids, and arranged with him to find a suitable
boarding-place for the girl. It was agreed that respondent
should be paid $100 to cover the expenses of board and his
medical services. Respondent engaged board for her at a
Mrs. Sleight's, who was then boarding one or two women
afflicted with the same trouble.

February 19, 1886, Mr. Noel, in pursuance of this arrange-
ment, brought his daughter to the respondent's office, paid
him $90, and returned home. It appears that he afterwards
paid the doctor the remaining $10. Hamilton gave Noel $25
in money, and his note for $100, the agreement being that
he should pay all necessary expenses.

The same evening, after dark, she arrived at Mrs. Sleight's.
She drank a cup of tea, and went to bed about 8 o'clock.
Soon after, she called Mrs. Sleight, who found her suffering

from a chill.   She was sick from that time until the twenty-sixth day of February, 1886, when she died.   Aikin visited her, and prescribed for her during her sickness.

On Sunday morning, February 21, she was delivered of a dead *fœtus*.   Mrs. Sleight thinks the child was between five and six months old.   She swears that Dr. Aikin came that morning, removed the after-birth, and took away the *fœtus* in a hand satchel.   He also directed ergot to be administered to stop flooding.   On Monday following, the respondent brought Dr. Sligh there.   During the girl's illness be also brought a Dr. Best with him to see his patient, who visited her three or four times, in company with respondent, between the twenty-second of February and the time of her death.   Dr. Sligh first saw the girl on the twenty-second of February.   He called upon her at the request of respondent.   He visited her but once.   Respondent asked him to go the next day, but he refused, and thereupon Dr. Aikin procured the services of Dr. Best, who first saw her on the twenty-third.

The next day after her death, a *post mortem* examination was held, principally conducted by Dr. De Camp, who was assisted by Drs. Edie, Clark, Graves, and Bradish.

On the eighth day of March, 1886, Dr. Aikin was arrested upon a warrant, issued by the judge of the police court, charging him with manslaughter.   He had an examination on such warrant, and on the fourteenth day of May, 1886, was bound over to the superior court of the city of Grand Rapids to await his trial.   In the September term of that court the prosecuting attorney filed an information against him, said information containing four counts.

The first count corresponded with the complaint and warrant, and alleged that on the twenty-sixth day of February, 1886, at the city of Grand Rapids, in the county of Kent, the said Nathan J. Aikin feloniously and willfully did kill and slay one Mary Noel, contrary to the statute, etc.

The second and third counts charged statutory manslaughter

(How. Stat. § 9107), the second count alleging the administering of medicines and drugs, and the third the use of an instrument.    These counts charged the means of the abortion with having been used on the nineteenth of February, 1886.

The fourth count was as follows:

"And the prosecuting attorney, who prosecutes as aforesaid, further gives the said court here to understand and be informed that the said Nathan J. Aikin, late of the city aforesaid, at the county aforesaid, on, to wit, the said nineteenth day of February, A. D. 1886, at the city aforesaid, in the county aforesaid, took the care and charge of the said Mary Noel, she, the said Mary Noel, being then and there pregnant with child, as a man mid wife, and to assist and attend upon and take care of her, the said Mary Noel, and to do everything needful and proper to and for her during and after the time of her labor and delivery of the said child wherewith the said Mary Noel was then and there pregnant.

"And that the said Nathan J. Aikin afterwards, and while he had such care of the said Mary Noel as aforesaid, and immediately after the said Mary was delivered of the said child wherewith she had then lately before been pregnant, to wit, on the twenty-first day of February, A. D. 1886, at the city aforesaid, in the county aforesaid, her, the said Mary Noel, lying on a bed in great illness, pain, and weakness, did on said last-mentioned day there feloniously neglect and refuse to attend upon, and to take proper, sufficient, and necessary care of, and to render her proper and necessary assistance, and did then, on said last-mentioned day, there feloniously neglect and refuse to do to and for her, being in such state, and did then, on said last mentioned day, there leave and desert the said Mary Noel in such state as aforesaid, without a proper and sufficient person to take care of her, and to do for her what was needful for her, being in such state, and unable to take care of and to do what was needful and necessary for herself.

"And that by reason and means of the said Nathan J. Aikin there, on said last-mentioned day, so neglecting and refusing, as aforesaid, to do to and for her, the said Mary Noel, what was needful and proper for her, and by the said Nathan J. Aikin so leaving and deserting the said Mary Noel as aforesaid, she, the said Mary Noel, became mortally sick, emaciated and enfeebled in body, and of said mortal sickness,

emaciation, and feebleness of body, on and from the said last-mentioned day until the said twenty-sixth day of February, A. D. 1886, at the city aforesaid, in the county aforesaid, did languish, and languishing did live; on which twenty-sixth day of February, A. D. 1886, she, the said Mary Noel, at the city aforesaid, in the county aforesaid, of the said mortal sickness, emaciation, and feebleness of body died.

"And so the said Nathan J. Aikin, in manner and form aforesaid, feloniously did kill and slay the said Mary Noel, contrary to the statute in such case made and provided, against the peace and dignity of the people of the State of Michigan."

Upon the trial the first count was practically abandoned, and the jury returned a general verdict of guilty upon the last three counts. The case is brought here upon exceptions before judgment. A large number of errors are assigned, but we shall notice only those that we think are important.

The counsel for the respondent moved, after the withdrawal of the plea of not guilty, which had been entered *pro forma*, and before trial, to quash the second, third, and fourth counts of the information, on the ground that the offenses charged therein were not the offenses named in the complaint and warrant,[1] and on which the respondent was examined in the police court, and for the further reason that the fourth count stated no crime whatever. The motion was overruled, and exception taken.

As far as the second and third counts are concerned, the question must be considered as settled in favor of the ruling of the court below. It is not necessary to review the reasons for this holding. It has been sufficiently discussed in *People v. Sweeney,* 55 Mich. 586; *People v. Sessions,* 58 Id. 594; and *People v. McDowell,* 63 Id. 229.

But in relation to the fourth count I am satisfied that the motion should have been sustained. I do not think it is governed by either of the decisions above cited. The second and third counts are only used to state the commission of the

---

[1] The complaint and warrant charged respondent with manslaughter in the *statutory* form.

same statutory crime of manslaughter by the use of different means, both of which are embodied in the statute. But the fourth count does not come within the statute, nor can it be considered as charging in any manner the crime of manslaughter by an attempt to produce an abortion, or by an abortion. It charges an offense entirely removed from any hint of anything but a natural birth, and the sickness of the mother resulting therefrom, without the criminal act of any person. It puts the respondent on trial for the criminal neglect of the respondent as a man midwife, to whom the care of the patient had been committed, and undertakes to hold him responsible for her death because of such criminal neglect, and for nothing else.

It is conceded, as it was decided in *People v. Olmstead*, 30 Mich. 431, that the first count could not be used to convict the respondent of the offense charged in this fourth count, or of any manslaughter arising out of any negligence or fault from which death was a consequential result. The first count could only be used in cases where the killing resulted directly from acts of violence. *People v. Olmstead*, at pages 438, 439. The allowance of the use of the second and third counts, based upon a complaint and warrant charging manslaughter as in the first count, has been justified in this Court upon the ground that the crime charged therein "grew out of the same transaction—the same facts—as in the first." See *People v. Sessions*, 58 Mich. at pages 596, 597. But it must be remembered that, when this doctrine is applied to these two counts, it cannot be extended so as to admit also of the use of this fourth count, without running squarely against the very principle upon which the allowance of the second and third counts is based. If these counts grow out of the same transact.on as the first,—the same facts,—then the fourth count cannot, as the charge in that count does not involve the same transaction or the same facts as in the second and third. Upon a trial upon the second and third

counts alone, the criminal negligence of the defendant in his care of the girl would not be material, unless it had some tendency to show that he was guilty of either administering drugs or using an instrument to commit abortion, from the effects of which she died. And most certainly, if he had been tried upon the fourth count alone, evidence tending to show that he had administered drugs, or used an instrument, prior to the date of the neglect charged, to cause abortion, would have been not only immaterial and irrelevant, but its admission would have been error.

Neither can it be said that the crime alleged in the fourth count is contained within the offense charged in the first count, and in the complaint and warrant, as a lesser crime within a greater, as was held in *People v. Sweeney, People v. Sessions,* and *People v. McDowell,* heretofore cited. Manslaughter is charged in both,—a crime of the same degree.— but growing out of different facts, circumstances, and conditions, and totally different in the means or methods of causing death. The one is the direct criminal act against which the statute has set its bar, and denominated manslaughter. The other is the omission to perform a duty, which omission, death resulting, the common law has made manslaughter as the penalty of the negligence, which thus becomes criminal.

But whether I am right or not in the opinion that, if the second and third counts were allowed to stand, the fourth should have been quashed, it seems absolutely certain that the prosecutor should have been called upon by the court to elect under which theory he would ask the conviction of the respondent. The counsel for respondent requested the court to instruct the jury that no conviction could be had under the fourth count, which request was denied, and the case virtually submitted upon the last three counts. The prosecution were permitted to argue both theories to the jury:

1. That he was guilty of committing abortion.

2. That he was guilty of criminal neglect in his care of the sick girl after the miscarriage.

Under the general verdict he was found guilty upon all the counts. It was not pointed out to the jury that they might acquit upon the second and third, and find him guilty upon the fourth, or *vice versa.* Therefore it may be possible that a portion of the jury based their verdict upon the second and third counts exclusively, and another portion upon the fourth alone. There can be no safety in such a practice as this. They were not instructed that, if they failed to find him guilty under the fourth or any count, they must acquit upon that count, or that it was necessary to find him guilty of all the counts in order to bring in a general verdict against him. And no one can know of what particular crime of the two he was convicted.

It is said in *People v. McKinney,* 10 Mich. 94, 95, that where several offenses are charged, distinct in point of law, and the trial of these several offenses would involve the proof of substantially different transactions, and thereby tend to confuse the defendant in his defense, or deprive him of any substantial right, the court should either quash or compel the prosecutor to elect which offense he will ask a conviction upon. But when the several offenses charged, though distinct in point of law, yet spring out of substantially the same transaction, or are so connected in their facts as to make substantially parts of the same transaction, or connected series of facts, the defendant *cannot be prejudiced in his defense* by the joinder, and the court will neither quash nor compel an election.

"In the present case [*People v. McKinney,* 10 Mich. 95] the information charges apparently several offenses of the same kind, and, if the evidence related to several substantially different and distinct transactions, it would have been a proper case for putting the prosecutor to his election."

There were in this information in the case at bar two dis-

tinct and separate offenses charged upon different days, upon either of which, standing alone, the respondent might have been acquitted, or the jury have failed to convict by a disagreement. The second and third counts charge the means of abortion as being used on the nineteenth of February, or at least before the delivery of the child, on the twenty-first, while the criminal neglect averred in the fourth count is alleged to have taken place on the twenty-first, and after the birth or expulsion of the *fœtus*. He had no means of knowing upon which charge the prosecution relied, and the court at the close of the testimony refused to compel any election. It follows, then, that the jury may have agreed upon a general verdict of guilty, or at least they were permitted so to do, while yet unable to agree upon either one of the counts. *Tiedke v. City of Saginaw*, 43 Mich. 64; *Hamilton v. People*, 29 Id. 173, 177, 178.

The true and only just rule as regards the joinder of counts in an information or indictment seems to be, if the different counts are drawn and used with a view to one and the same transaction, so that one of them, upon the trial, may be found to meet the evidence, the court will not interfere with the proceeding, as such an object is a legitimate one. It is a proceeding calculated to promote justice, and cannot confuse or prejudice the defense of the accused. But when the object and purpose is apparent to prosecute the respondent, and such is the logical effect, for separate felonies by means of one information or indictment, the court will not permit it to be done. The prosecutor has no right to do this, as its injustice and prejudice to the accused overbalance all possible benefits to be derived to the public from such a practice. See 1 Bish. Crim. Proc. §§ 205–213, inclusive; *Mayo v. State*, 30 Ala. 32; *State v. Smith* 8 Blackf. 489; *Sarah v. State*, 28 Miss. 267; *M' Gregg' v. State*, 4 Blackf. 101, 103; *Baker v. State*, 4 Ark. 56; *Kane v. People*, 8 Wend. 203; *People v. Rynders*, 12 Id. 425; *State v. Nelson*, 8 N. H. 163; *State v.*

*Flye*, 26 Me. 312; *State v. Fowler*, 8 Fost. 184; *Bailey v. State*, 4 Ohio St. 440; *People v. Austin*, 1 Parker. Crim. R. 154; *Reg. v. Trueman*, 8 Car. & P. 727; *People v. McMillan*, 52 Mich. 627; *People v. Jones*, 24 Id. 215; Maxw. Crim. Proc. 53; *Com. v. Sullivan*, 104 Mass. 552; *Bainbridge v. State*, 30 Ohio St. 264; *State v. Henry*, 59 Iowa, 391 (13 N. W. Rep. 343); *Hamilton v. People*, 29 Mich. 173, 177.

Tested by this rule, it is apparent that the respondent in the case at bar has not been fairly tried. The question was raised upon the trial in a variety of ways, and numerous endeavors made by his counsel to prevent his being tried and convicted for these separate offenses under one information, but in vain. The evidence tending to show that he committed an abortion upon this girl in his office before she ever went to the house of Mrs. Sleight, and that he gave her a "black medicine," for the same purpose, after she arrived at Mrs. Sleight's, and before the delivery of her child, and which medicine, it being in a bottle, he took away, was permitted to be used to convict him, under the fourth count, of having criminally caused her death by neglecting and refusing to take proper care of her after the child was born; and, on the other hand, the evidence tending to show that he neglected her after the child was born was allowed to be used to convict him, under the second and third counts, of having caused her death by abortion by medicines, drugs, or instrument administered or used previous to the date of the expulsion of the *fœtus*. Thus the evidence legitimately tending to show one crime was also illegally used to convict the respondent of another offense which it had no tendency to prove, and *vice versa*.

I cannot approve of this course of procedure in a criminal case of this magnitude, nor can I find any reputable authority that sustains it. The two offenses charged did not relate to one and the same transaction, nor were these counts framed and used as different ways of charging the same offense. One

was a statutory manslaughter created by the Legislature, and unknown to the common law, and the other manslaughter by the common law, and not the creation of the statute. Nor is this all. The two alleged offenses are as different in their nature, and in the means of bringing about death, as they well can be, and one is radically inconsistent with the other. He could not be guilty of both at the same time and with the same person. If the drugs he administered, or the "mortal bruises and wounds" he gave her, caused her death, as stated in the second and third counts, his neglect after the twenty-first of February did not kill her; and, if her death was caused by neglect after such date, then the drugs and bruises given before that time did not destroy her.

But I will not pursue the matter further. It seems to me unanswerable that no man should be prejudiced in this manner when on trial for a capital offense. He has a right to be warned by the complaint and warrant of what he is accused, and ought not to be convicted of two different crimes, committed at different times, under one information, with the evidence of each confounded as a whole, and used indiscriminately to convict him of both. Such a proceeding violates every principle of justice, and places him at the mercy of the prosecutor; and, as, in this case, evidence not competent to prove one of the offenses, but admissible as to the other, is used to establish both crimes. Such a trial must necessarily be an unfair and illegal one.

It is also complained that the court, against the repeated objection of the respondent's counsel, violated the method of proceduce in the introduction of testimony, as to its order, pointed out and established by this Court in *People v. Hall*, 48 Mich. 485, and *People v. Millard*, 53 Id. 67, by permitting the prosecutor to show facts and circumstances tending to prejudice the respondent before the *corpus delicti* was established.

The first witness placed upon the stand was John Noel, the

father of the dead girl. He testified to her age and the date of her death, and the time that she left home for Grand Rapids, and that she was then pregnant, and to some other things which, although objected to, were not material as far as the order of proof was concerned. He also testified to matters connecting Dr. Aikin with the care and charge of the girl, under the agreement heretofore spoken of, which, s'rictly speaking, ought not to have been permitted at that time, before any of the facts attending the girl's sickness and death had been given. But we do not think any great harm was done, as the court, before the examination in this line had proceeded to any great length, advised the prosecutor that he was not pursuing a very safe course under the rulings of the Supreme Court. The prosecuting attorney thereupon dismissed the witness, and proceeded to examine Drs. De-Camp and Edie as to the result of the *post mortem.*

When their evidence was concluded, Mrs. Anna Sleight was called as a witness. She commenced to give a history of the girls stay in the house, commencing with the respondent's contracting for her coming there. This was objected to, and the prosecutor was asked by defendant's counsel if he was through with the evidence of the *corpus delicti*. He answered that this (the evidence of the two doctors) was all the testimony the prosecution had as to the *post mortem,* but they were not through as yet with the *corpus delicti*. The objection was then reiterated; defendant's counsel stating that it was incompetent, as not being the correct order of proof, and that they desired to have the testimony completed upon the point of the death from criminal causes, so that a motion might be made to test the question of a criminal death being established. The objection was overruled, and Mrs. Sleight permitted to proceed. The witness then gave in detail, as well as she could, the story of the girl's sickness, her attendance received and medicines taken, the delivery of

the child, and all the subsequent events as they took place up to the hour of her death.

There was no error in the admission of this testimony. The evidence of the physicians tended to show that the death of this girl was produced by abortion, and it was competent, as tending in the same direction, to show the illness of the girl from its commencement, and how she came to be at this house where she died. The *corpus delicti* was not only to be established by the *post mortem*, but also by the fact of her pregnancy, her illness, her treatment and by whom, and her condition generally up to the time of her death. A history of her illness from the very beginning to the end, in detail, was most proper, and perfectly legitimate to prove the *corpus delicti;* and what the respondent did and said in connection with such illness while in the house attending upon the sick girl was properly a part and parcel of such history.

In *People v. Hall,* 48 Mich. 485, and *People v. Millard,* 53 Id. 67, to which we are cited, the testimony held to be improperly admitted, as to its order, was evidence of the respondent's illicit relations with other women, and not connected with the illness and death of the deceased. In those cases the improper evidence went to the motive of the accused, and had no business before the jury until the criminal death was established. Here the testimony objected to appertained directly to the cause of death, and was manifestly a part of the main case.

On Monday night, two days and one night after the birth of the child, the girl had a talk with Mrs. Sleight, who was at that time taking care of her. The deceased was vomiting, and said: "Oh! ain't it awful, that awful medicine?" Mrs. Sleight replied: "Yes. What made you take it?" And the girl then said she was persuaded to take it; the doctor was to blame,—Dr. Aikin,—and that she was not to

blame herself.   Mrs. Sleight testified that the medicine she was talking about was a " black medicine " that Dr. Aikin took away upon Sunday morning, and that the deceased took some of it on Saturday night.

The prosecuting attorney's assistant, Mr. Fairfield, claimed upon the argument, as appears by the record, that this talk of the girl established the fact that the abortion was produced by this very medicine administered by the respondent on Saturday evening.

It is insisted that this statement of the girl was hearsay, the narrative of a past transaction, not a part of the *res gestœ,* and therefore inadmissible.   We do not think the admission of this testimony can be sustained on any legal grounds.   It is not pretended that it was a dying declaration, and it was not a part of the *res gestœ.*   Anything that she said during her illness, as to her present pain or suffering, might properly have been admitted to show her present condition, and her symptoms at the time she made the declaration; but her narration of what the respondent had said or done a day or days before she made the statement was purely hearsay, and could not be admitted under any exception to the general rule excluding such testimony.

It is evident from the record of the trial, as we have it before us, that this statement of the deceased, on Monday evening, of what took place on Saturday evening, was used with the most damaging effect against the respondent. There was no possible way of disputing it, and it was error to receive it.

Several assignments of error are raised upon hypothetical questions propounded by the prosecutor to Drs. Sligh, Best, De Camp, and Weston, but we are unable to find anything improper either in the form or substance of such questions.

Dr. Maxim, a medical expert called by the defense, had read the testimony of Drs. Edie and De Camp, the only witnesses sworn as to the *post mortem* examination.   He was asked this question:

" *Q.* Do you know what they state there with reference to any violence having been used upon the body of Mary Noel, or marks or abrasions, or anything of the kind?

" *A.* I do.

" *Q.* I desire to ask you now, if, in your opinion, this degenerated condition of the *os* and neck of the womb, as described by Dr. De Camp, could exist in *post mortem* cases when no interference whatever had been made?"

This was objected to and properly excluded. The facts as testified to by Dr. De Camp, as to this particular condition of the parts named, should have been stated to the witness; otherwise the jury could not know upon what facts Dr. Maxim was stating his opinion. An expert can never be safely permitted to state that he has read or heard the testimony of a witness or witnesses, and then base his opinion upon such testimony, without stating the particular points of the evidence—the facts—upon which he rests his conclusion. There is no reputable authority for any such method of examining an expert witness.

Upon cross-examination the same witness was asked to tell the jury how he differed from what these doctors (De Camp and Edie) said about the case. This was objected to by defendant's counsel, and it is contended that, if the direct inquiry above noticed was not proper, the last question must be governed by the same rule. This is not so, as the inquiry itself called upon him to state what the other doctors said, and to give his reasons, if any, why he differed from them. This he could not well do without stating the specific facts upon which his reasons were based. And, in answer to the question, it clearly appeared that he could not state wherein he differed from them upon the state of facts as testified to by them.

It is also claimed that, in three of the hypothetical questions put to this same witness by the prosecution on his cross-examination, matters were contained, as facts upon which to base said questions, which the evidence did not warrant to be assumed. We are satisfied, from a close examination of the

record, that there was evidence from which it might legitimately have been inferred that the deceased was, previous to her coming to Mrs. Sleight's, strong, healthy, and robust, and that spots were discovered upon the examination of the womb, that might have been made by a little round instrument. It is not so certain about there being any testimony that " the blood had coagulated " upon little places at the neck of the womb, but there was evidence that there had been what the physicians called an extravasation of blood of the tissues, or a settling of blood in the tissues, causing inflammation. This was probably what the counsel meant to refer to, and we do not consider the discrepancy, if it can be called any, between the assumed fact and the one in evidence, at all material or harmful in its effects upon the respondent's rights.

It is also assigned as error that the court allowed the case to go to the jury upon any of the counts in the information, and it is argued that there was absolutely no evidence tending to show that the respondent was guilty of either of the offenses charged against him. It is true that the evidence was circumstantial. There was no testimony of any eye witness who saw an instrument used, or of any person that could positively and directly show that any medicine or drug administered by the respondent caused the unnatural birth of the child. It could not well be expected that this would be so. Without expressing any opinion as to the weight of the evidence, we are satisfied that there was sufficient testimony to be submitted to the jury upon the second and third counts, and that we should not disturb a verdict of guilty upon either one of them if otherwise a fair trial had been afforded the defendant. And it was proper that these two counts should be joined in the information, as they manifestly related to the same offense and the same transaction, and one was varied from the other only to meet the evidence as it might be adduced.

But I am also satisfied that the court erred in submitting the offense charged in the fourth count to the jury. There was absolutely no evidence tending to show any criminal neglect of the deceased after the birth of the child. Not only was the attendance of the respondent persistent and repeated, but he called other reputable physicians, one of whom was there at least three times, and on as many different days, and there is no complaint that his treatment was faulty, or that he did not do all he reasonably could to save her life. The time when he neglected to see her, when called for by Mrs. Sleight, was on Saturday evening, before the miscarriage. But the neglect averred was afterwards. Nor is there any just reason for charging him with the coldness of the room, or the condition of the bed or bedding. It seems that no one found any fault with the arrangements Mrs. Sleight had made for this girl's reception, or the condition of the room she was in, excepting the respondent himself, and none of the testimony except his own, unless it be by inference, would warrant any assertion that she was neglected as far as the appointments of the room were concerned. Mrs. Sleight herself, a witness for the prosecution, testifies that it was comfortable in every respec, and Dr. Sligh, who was also attending a patient there, and had been doing so before this girl came there, does not find any fault with the surroundings of the deceased.

And yet Mr. Fairfield was allowed to inflame the jury as follows:

"He finds her upon a bed of straw; he leaves her upon a bed of straw; and on Saturday night, when the old man Sleight goes to him, and says she is worse,—'Come up, doctor, your patient is worse,'—he tells you, in his own tongue, upon the stand, that it was a cold night; that he was not feeling very well; and he did not go up.

"When he got $100 of this man's money to see to his eldest daughter, that she should not suffer, he lays quietly down in his warm bed, and then and there sleeps, lets her lay upon a bed of straw while her life ebbs away by the blood that is

drawn from her by his very acts, perpetrated upon that Friday that she was in his office. Then talk to me about not being criminally negligent in taking care of this girl! It is idle and nonsensical to talk about it. * * * He put her upon a bundle of straw, and let her die like a dog, except that he trotted around the city, and got in physicians to prescribe from time to time."

And he was permitted to use plenty of language of like import. It will be remembered that the Saturday night Mr. Fairfield refers to was before the delivery of the *foetus*, and the respondent's action at that time is not informed against in this fourth count.

The bundle of straw referred to is shown by the testimony of Mrs. Sleight and others to have been a straw-tick newly filled. Mr. Sleight and wife testify that there was a stove in an adjoining room that kept this room sufficiently warmed, and there is no evidence that it did not do so. They also both testify that the room and the bed were comfortable in every respect, and there is no evidence to the contrary except that of Dr. Best and the respondent, who simply testify that they suggested changes of linen, and other changes at times. The mother of the girl, who was present during the last days of the daughter's illness, found no fault whatever, in her testimony, with the condition of the room or bed, or the care that was given the patient by the respondent. Her removal was talked of by Dr. Best and the respondent, but the mother thought she could not be safely carried home. The criminal neglect seems to have been more in the imagination of the counsel for the prosecution than in fact. There is no warrant in the evidence for any such charge, at least after the birth of the child.

As to the room not being properly heated, it will be noted, upon an examination of the record, that the prosecuting attorney undertook to prove by Mrs. Noel, the mother of the girl, that the room the deceased had been accustomed to sleep in at home was no warmer than the one she occupied

at Mrs. Sleight's; and that he made this offer, to use his own language, for the purpose of proving that the chill could not "be accounted for by going into a cold room; simply to show that it was not any different than she had been accustomed to." This proof was ruled out by the court as immaterial. And yet the lack of warmth in this room was repeatedly made the basis of an argument to the jury to show criminal neglect on the part of the respondent in allowing her to remain there.

There can be nothing gained in the end by an overzealous and unfair perversion of facts in order to convict an accused person of a crime of which the prosecutor may have good reason to believe him guilty, and which, as in this case, may be hard to establish by the ordinary and established methods of procedure. While the zeal of the prosecutor may be well excused, and the hot and bitter language that comes from the heart, involuntarily, of one who is thoroughly impressed with the heniousness of the crime, and the guilt of the respondent, is to be expected in such cases, it is nevertheless the duty of the court, sitting impartially between the people and the prisoner, to check and control any intemperance of zeal or language that is not warranted by the facts and circumstances shown by the proofs. If this is not done, as it was not in this case, the final court of review, removed entirely from the passion and prejudice that generally surround the trial in the lower courts of cases of this nature, will see to it that the injustice is corrected, and a new trial granted.

By this permission of unfair and unjust conduct on the part of the public prosecutor or his assistants, not only is the course of justice perverted, but added cost and delay are the natural consequences of the attempt of the court of last resort to give to every citizen accused of crime the protection granted by the Constitution,—a fair trial before an impartial jury.

It must also be remembered that, however heinous the

crime, and however difficult it may be to establish it by the usual and approved means of procedure, and no matter how firmly the public prosecutor and the community at large may be satisfied of the guilt of the accused, and even though in fact he may be guilty, the rules and methods of trial, permitted to be relaxed or disregarded in his particular case, with perhaps the laudable object and desire that justice may be done, must nevertheless, as a natural consequence of the ways of our jurisprudence appear hereafter, as so relaxed or disregarded, as precedents to be used against all persons accused of crime, to vex the innocent as well as the guilty. There is therefore no safety and no justice in allowing the supposed merits of a particular case to override and set aside, even for a moment, the barriers that our Constitution and laws have hedged about the citizen when arraigned and put upon trial for an alleged crime.

A substantial error was also committed by the court in his charge to the jury, as to the proof required for conviction. He instructed them as follows:

"The rule requiring the jury to be satisfied of the defendant's guilt beyond a reasonable doubt in order to warrant a conviction, does not require that the jury should be satisfied beyond a reasonable doubt of each link in the chain of circumstances relied upon to establish the respondent's guilt. It is sufficient if, taking the testimony all together, the jury are satisfied beyond a reasonable doubt that the defendant is guilty."

The defendant's counsel had before that requested the following instruction, which was refused:

"If the jury find that one material fact proven in the case is inconsistent within the theory of guilt, as claimed by the people, then the respondent must be acquitted."

There is some authority to sustain this portion of the charge of the court. See Sackett, Instructions, 483; *Houser v. State*, 58 Ga. 78; *Jarrell v. State*, 58 Ind. 293; *State v. Hayden*, 45 Iowa, 11. The latter court say:

66 MICH.—31.

"It is not a reasonable doubt of any one proposition of fact in the case which entitles to an acquittal. It is a reasonable doubt of guilt arising upon a consideration of all the evidence in the case."

This language may be and probably is good law when applied to any proposition of fact in the case, the establishment of which is not absolutely necessary to the conviction of the accused. But it is not good law, in reason, or by the weight of authority, when applied to a fact material and necessary to establish the defendant's guilt, which, in the common wording of the books, is called a *link* in the *chain* of circumstances. When a link is out, the connection of the chain is broken, and the chain goes no further than to the missing link. To complete the chain, the link is necessary, and it may be in the center, and the most important of all. If one link may be left out, another may, and in the end the jury may be authorized to throw a few established links together in a heap, and guess that the chain is completed, or would be if the other links could be found.

Reese, J., (in *Marion v. State*, 16 Neb. 359) in speaking of a similar charge to the one under consideration, very aptly says:

"What is meant by the word 'link' as used therein? If the jury were given to understand that it referred only to evidentiary facts which might add force or weight to other facts from which the inference of guilt could be drawn, then the instruction might be said to be correct; but if, by the use of the word 'link,' is meant such criminative facts which of themselves form the chain of evidence from which the inference of guilt is to be drawn, then the instruction does not state the law correctly. No chain can be stronger than its weakest link. If the link is gone, it is no longer a chain. If the word 'link' here refers to those circumstances which are essential to the conclusion, it is not a correct statement of the law."

In the case before us the court refused to instruct the jury that any material fact proven in the case inconsistent with the theory of guilt would entitle the respondent to an

acquittal; and the charge in relation to the links in the chain, taken in connection with such action, must have given the jury to understand that a material fact might be wanting, and yet upon the whole case they might convict the respondent. It has always been held, in cases of purely circumstantial evidence, that if any of the facts or circumstances established be absolutely inconsistent with the hypothesis of guilt, that hypothesis cannot be true. The hypothesis of guilt is to be compared with the facts proved, and with *all* of them. Burrill, Circ. Ev. 736, 737; Whart. Crim. Ev. (9th ed.) § 18; Wills, Circ. Ev. (3d ed.) 17.

The verdict of guilty in a criminal case resting upon circumstantial evidence is built upon a series of facts connected logically together, and one fact succeeding another in a certain order; one fact resting or depending upon another as a result of the proceeding. These material and essential facts necessary to convict, following one another, and each adding strength and conviction to the other and the whole, and which, as a whole, complete a perfect and irresistible chain, must each and every one be established and proved. And who can say that this chain, so formed is a perfect and complete chain to a moral certainty, or beyond a reasonable doubt, if there be a want of such moral certainty or a reasonable doubt as to the existence of one of these links, without which the chain is broken and incomplete? Each necessary link, each and every material and necessary fact upon which a conviction depends, must be proved beyond a reasonable doubt. *People v. Fairchild,* 48 Mich. 31; Burrill, Circ. Ev. 733–756; *Com. v. Webster,* 5 Cush. 296, 313, 317, 318; *Walbridge v. State,* 13 Neb. 236 (13 N. W. Rep. 209); *People v. Guidici,* 100 N. Y. 503 (3 N. E. Rep. 493); *Bressler v. People,* 117 Ill. 422 (8 N. E. R. p. 62); 1 Starkie, Ev. 502; 3 Phil. Ev. (Cow. and H. notes) 472, note 288.

The charge of the court, except as heretofore noted, cannot be complained of. We do not think that any matter of

fact was incorrectly stated therein, or that anything was taken for granted by the court upon which there could justly be any dispute. It must be conceded from the evidence, we think, that the deceased, when she came to Grand Rapids, was pregnant with a quick child.

It is assigned as error that the court said to the jury that there was no dispute that there was an abortion from which Mary Noel died. It is evident, however, that in the use of the word " abortion " the court did not mean a criminal act causing an untimely delivery, but a miscarriage from some cause, either criminal or accidental. In fact, he informs the jury that he called it an abortion because the child had taken on the principle of life, and he claimed that the difference between abortion and miscarriage was that the first term was used when the child had become quickened with life, and the latter when the *fœtus* had not taken on life. From the whole charge the jury must have understood, as they were plainly informed, that the fact of a criminal abortion was not admitted, and that they must find such criminal abortion by the act or means of the respondent in order to convict him.

I am unable to find any other error in the proceedings than those above noticed. For these a new trial must be granted. Let it be certified accordingly to the superior court for the city of Grand Rapids.

CAMPBELL, C. J., and CHAMPLIN, J., concurred.

SHERWOOD, J. I concur in the result.