ARNOLD *v.* ELLIS.

1. WATERS AND WATERCOURSES—INLAND LAKES—LEVEL—ADMINIS-
TRATIVE AGENCIES—COURTS.

Inland lake level act, conferring on county boards of supervisors,
drain commissioners, and conservation department the authority
to determine level at which waters of inland lakes will be main-
tained, *held,* not to make such authority exclusive, so that
until it has been exercised, a circuit court may act to set the
water level of a pond as between parties to a suit (PA 1961,
No 146).

2. EQUITY—ADEQUATE REMEDY AT LAW.

Equity will not grant relief where there is an adequate remedy
at law.

3. TRESPASS—CONTINUING—EQUITY—JURISDICTION.

An owner of realty is entitled to equitable relief to prevent
permanent and continually recurring injuries to the enjoyment
of his property.

4. WATERS AND WATERCOURSES—POND—LEVEL—DETERMINATION—IN-
JUNCTION.

Injunction restraining defendants from raising water level in
pond above 786 feet above mean sea level, *held,* properly grant-
ed, where proofs showed that no great injury was occasioned
to defendants because ample water power would still be avail-
able with water at that level, and with water level higher,
water seeped through dike onto lands of plaintiffs, making
the lands wet and unusable.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 4, 10] 56 Am Jur, Waters § 163 *et seq.*
[2] 19 Am Jur, Equity § 100 *et seq.*
[3] 19 Am Jur, Equity § 81.
[5] 5 Am Jur 2d, Appeal and Error § 601.
[6] 5 Am Jur 2d, Appeal and Error § 602.
[7] 20 Am Jur, Evidence § 982 *et seq.*
    12 Am Jur 2d, Boundaries § 112.
[8, 9] 20 Am Jur, Evidence § 277.
[11–14] 12 Am Jur 2d, Boundaries § 64 *et seq.*
[15] 5 Am Jur 2d, Appeal and Error § 1014.

5. APPEAL AND ERROR—QUESTIONS REVIEWABLE—OBJECTIONS TO EVIDENCE.

   Specific objection to evidence must be made in trial court, or it will not be considered on appeal.

6. EVIDENCE—SUBJECT TO CONNECTION—MOTION TO STRIKE—WAIVER OF OBJECTION.

   Party opposing evidence admitted subject to later connection must move to strike evidence when connection fails, or he waives the objection.

7. SAME—SURVEY MAP—WATER LEVEL—BOUNDARIES.

   Survey map, made by United States Department of Interior in 1914, which showed pond level as 786 feet above mean sea level at a time shortly after defendants' predecessors in title acquired title to pond and flowage rights around it, introduced in evidence by plaintiffs as bearing on location of boundary line between parties, held, proper to have been considered by trial court as evidence rebutting defendant's evidence concerning pond level when defendants introduced that issue, as some of them had a right to do.

8. SAME—REBUTTAL EVIDENCE—APPLICATION.

   Either party is entitled to introduce evidence to rebut that of his adversary, and such evidence, when admitted, should be applied to any branch of the case or to any alleged facts or theory introduced into it.

9. SAME—REBUTTAL—DISCRETION OF COURT.

   Admission of rebuttal evidence rests in the sound discretion of the court.

10. WATERS AND WATERCOURSES—FLOWAGE RIGHTS—POND LEVEL.

    Establishment of pond level at 786 feet above mean sea level, as against defendants' contention that they had right to maintain higher level, held, consistent with right owned by defendants to flow plaintiff's land for distance of 1 rod from boundary dividing plaintiffs' and defendants' lands, where proofs showed that maintenance of higher level resulted in greater flooding than extent of flowage right, even though maintenance of such established level might not result in flowing over full width of defendants' flowage right.

11. BOUNDARIES—DESCRIPTION—CHANGING.

    The purpose of changing a description so as to conform to natural monuments is that the monuments were visible to the parties at the time of conveyance and more accurately indicate what was intended to be conveyed.

12. SAME—DISAPPEARANCE OF MONUMENTS—CHANGING DESCRIPTION.
     Description cannot be changed to conform to natural monuments
        intended by the parties to conveyance when the monuments
        no longer exist to serve as guidelines.

13. DEEDS—PRESUMPTIONS—INTENT—DESCRIPTION.
     A grantor is presumed to have intended to convey that which he
        has unambiguously described, and the land conveyed must be
        controlled by the written description.

14. BOUNDARIES—CHANGING DESCRIPTION—MONUMENTS.
     Change of angles or points to conform to monuments or deter-
        mining description as containing pond boundary at fixed
        water level plus 1 rod, *held*, error, when boundary of property
        owned by defendants could be ascertained by following course
        and distance description which gave trouble only because last
        call was supposed to close on monument which was erroneously
        described and no longer in existence.

15. COSTS—NEITHER PARTY PREVAILING IN FULL.
     No costs are allowed in case where judgment appealed from is
        affirmed in part and reversed in part, since neither party has
        prevailed in full.

Appeal from St. Joseph; Andrews (Mark S.), J.
Submitted Division 3 May 31, 1966, at Grand Rapids.
(Docket No. 1,108.)   Decided November 9, 1966.

Complaint by Robert Arnold, Vida Arnold, and
Janet Arnold by her next friend, Robert Arnold,
against Robert Ellis, Iola Ellis, Walter Ellis, Helen
Ellis, and City Bank and Trust Company, a Mich-
igan banking corporation, to establish boundary be-
tween plaintiffs' land and that of defendants, and for
incidental relief.   Cross claim by defendants Walter
Ellis and Helen Ellis against City Bank and Trust
Company for rescission of land contract.   Cross
claim by City Bank and Trust Company against de-
fendants Ellis for reformation of land contract.
Judgment for plaintiffs setting water level of mill-
pond, and boundary line.   Judgment for Bank on

both cross claims. Defendants Ellis appeal. Affirmed in part, and reversed in part and remanded.

*Jones, Webb & Jones,* for plaintiffs.

*Troff, Lilly, Bonow, Piatt &·File,* for defendants Robert and Iola Ellis.

*Quentin Fulcher,* for defendants Walter and Helen Ellis.

*Badgley, Domke, Morrison, McVicker & Marcoux,* for defendant City Bank and Trust Company.

HOLBROOK, P.J. Plaintiffs are the title holders and possessors of certain real estate in the township of Constantine, St. Joseph county, Michigan, described as follows:

"All that part of the Northwest Quarter (NW$\frac{1}{4}$) of Section Thirty-two (32) in Town Seven (7), South of Range Twelve (12) West, that lies west of flowed land and North of road leading from Constantine to Mottville, bounded North and West by Section lines. Except Ten acres in the Southwest corner, also except flowage. All in St. Joseph County and State of Michigan."

The plaintiffs acquired this property by will from Sim Arnold, the father of plaintiff Robert Arnold. Robert and Vida Arnold are life tenants, and their daughter, Janet Arnold, 12 years of age, holds the remainder interest. Sim Arnold, plaintiffs' predecessor, acquired the property in 1931 and 1936 by mortgage foreclosure and quitclaim deed. Mary Houser, Bertha O'Dell, John White, and possibly Peter Houser whose interest is not a matter of record, were Sim Arnold's predecessors in title. They were also the grantors of property now held by the

defendants. The four defendants, Robert Ellis, Iola
Ellis, Walter Ellis, and Helen Ellis, are purchasers
under a land contract. The defendants purchased
the property in 1958 from the Fargo Engineering
Company, which sold its vendor's interest to the de-
fendant City Bank and Trust Company of Jackson,
Michigan.

Beginning with the common grantors, the first con-
veyance of the property now held by defendants was
to William Dunn, in 1912. The description in this
deed granted property to the east of a line begin-
ning at a point in section 32 of Constantine township,
which meandered in a southerly direction through
31 calls and finally ended at an elm tree near a dam.
The deed also conveyed:

"a strip of land one rod wide, adjoining the westerly
side of the afore described tract and extending the
entire length of the said westerly side from the sec-
tion line at the north to the highway at the south,
containing 1.73 acres of land. With right to flow
the same with water for power purposes and water
privileges."

The property owned by defendants consists for
the most part of a pond created by a dam across Mill
Creek. The western shoreline of the pond runs gen-
erally south from the section line mentioned in the
above descriptions. There is, however, a small pen-
insula of land extending out into the pond on the
west side. From the south side of this peninsula,
the shoreline once again runs generally in a south-
erly direction until it reaches the road where the
dam is located. Near the northern section of the
property line a dike was constructed approximately
500 feet long and 20 feet wide apparently for the
purpose of holding back the water edge of the pond.
The land west of the dike is naturally low but usable
unless flooded. On the south side of the peninsula,

where the shoreline once again runs generally
south, there is a ridge which runs in a north south
direction approximately 20–30 feet west of the edge
of the pond. West of this ridge, the land is low and
generally unable to support heavy farm machinery.
The Arnolds use this ridge for the purpose of driv-
ing their farm machinery across the low land to
reach their north fields.

Another important factor in this case, apart from
the contour of the western edge of the pond and the
characteristics of the land immediately west of the
shoreline, is the level of the pond. The trial court
in this case determined that the level of the pond
should be maintained at a height no greater than
786 feet above mean sea level. Prior to the start of
this litigation, the defendant installed flash boards in
the spillway and raised the level of the pond to 788.62
feet above mean sea level. Since the bottom of the
pond at the spillway was 772.15 feet, the defendants
were maintaining a head of water of about 16.47
feet. At this height, the water from the pond seeped
through the dike north of the peninsula and flooded
the property west of the dike. It also washed out a
causeway at the extreme north end of the pond which
was used by John Oldenberg to get from one field to
another. Behind the dike, plaintiffs' exhibits show
large trees standing in water which was estimated
to be anywhere from 1 foot to 2½ feet deep. Al-
though the property west of the dike was naturally
low and therefore wet, it had never been submerged
to that extent.

Although the height of the pond at the time of the
original 1912 conveyance from the common grantors
was very much in dispute, the following facts seem
reasonably certain. The United States Department
of Interior made a survey in 1914 and found the level
of the pond to be 786 feet above mean sea level. The
Peoples Light & Power Company used the dam to

generate the electricity which provided the power for the first electric lights for the town of Constantine. The Power Company raised and lowered the level of the pond at varied intervals, but apparently this did not disturb neighboring property holders. The Power Company gave up on the pond in 1918 and from then until 1941 little was done with it except for releasing the water in 1938 because of a weakening of the dam over which a public highway ran.

The Fargo Engineering Company purchased the property in 1941, because one of the owners, a Mr. Hunt, was interested in hydro-electric operations as a hobby. He never went beyond rebuilding the spillway, however, because he could not obtain a clear title to the power house located on the south side of the highway. When Fargo decided to sell this property, it was listed as a pond and dam with a 16-foot head. The listing expired without a sale, and thereafter Fargo told interested purchasers, including defendants, that there would not be over a 14-foot head. The purpose of this was to protect the causeway, used by Mr. Oldenberg, located at the north end of the pond. The defendants purchased the property in 1958. Mr. Walter Ellis contemplated moving his business to the site of the dam so as to take advantage of the cheap power source. There was testimony to the effect that a 14-foot head would produce a sufficient amount of electrical power for this purpose.

In 1960, Robert Ellis raised the level of the pond causing the flooding of the land west of the dike and the destruction of the causeway. He also had the property surveyed. After this survey, Robert Ellis built a fence around what he thought to be his property. The fence ran from the spillway along the road, across plaintiffs' driveway and ended at plaintiffs' front door. It started again at the back door

of the house and ran in a northerly direction through plaintiffs' soybean field well west of the ridge which ran alongside the western shore of the pond. Because of the fence, plaintiffs could not reach the fields located on the northern part of their property.

Plaintiffs brought suit in the circuit court for St. Joseph county. The court ordered defendant to remove the fence and set the maximum pond level at 786 feet above mean sea level. The parties to the suit were Robert and Vida Arnold, plaintiffs, and Robert and Iola Ellis and the City Bank and Trust Company, defendants. The court reserved jurisdiction to determine the actual property line if that became necessary at a future date.

The primary purpose of the second suit, out of which this appeal arose, was to determine the boundary between the two parcels of property. Janet Arnold was joined as a plaintiff and Walter and Helen Ellis were joined as defendants. The Bank entered a cross claim against the Ellis family for reformation of the deed and Walter and Helen Ellis sought rescission of the land contract. Robert and Iola Ellis did not join in the claim for rescission.

The court reaffirmed the pond level of 786 feet and set the boundary line as the shoreline when the pond is at 786 feet plus one extra rod around the west side of the pond. The contract between the defendant Bank and the Ellis family was reformed to conform with this description. The rescission claim was denied.

Defendants-appellants raise the following questions for this Court to consider on review: (1) Did the court have power or jurisdiction to set the pond level at 786 feet above mean sea level? (2) Did the court err in deciding that the only reliable proof of the pond level was the survey made by the United States Department of Interior? (3) Did the court err in restraining defendants from raising the pond

level above 786 feet for the reason that plaintiffs had knowledge of defendants' right to flow plaintiffs' land? (4) Did the trial court err in not attempting to set the boundary by angular adjustments of known distances as found in the deeds of the parties? (5) Did the trial court err in setting the boundary? (6) Did the trial court err in granting reformation to the City Bank and Trust Company without taking into consideration the land loss to appellants?

Defendants contend in their brief that the inland lake level act of 1961, PA 1961, No 146, as amended (CLS 1961, §§ 281.61–281.86 [Stat Ann 1965 Cum Supp §§ 11.300(1)–11.300(26)]), operates to preclude the circuit court from exercising jurisdiction in this matter because the act vests the power to determine lake levels in the county boards of supervisors, drain commissioners and the conservation department. The predecessor of this statute was CL 1948, § 281.101 *et seq.* (Stat Ann 1960 Rev § 11.221 *et seq.*), under which *Drainage Board* v. *Village of Homer* (1957), 351 Mich 73, 84, 85, was decided. Quoting from *Kennedy* v. *Van Buren County Drain Commissioner* (1916), 189 Mich 676, 679, 680, the Court said:

"'The act does not appear to be mandatory, but merely *optional* with the several boards whether they shall assume jurisdiction in any particular case. Had the legislature provided that the waters of inland lakes should remain at their present level, unless changed by the board of supervisors, or had it used some language indicating an intention to place the whole subject-matter at once under the jurisdiction and control of the board, the construction contended for by counsel would have more force. Our conclusion is that the act does nothing more than to confer upon the board of supervisors the authority to act in any given case where, in its judgment, it is necessary or expedient.'" (Emphasis supplied.)

Clearly, the act as it stood at the time of this decision did not confer exclusive jurisdiction upon the county boards of supervisors to determine lake levels. Until the agencies mentioned in the statute elect to act under the authority of the statute, there is no reason why a court may not act.

The statute before the court at the time of the *Village of Homer* decision, *supra,* provided:

"The board of supervisors of any county in which the whole or any part of the waters of any inland lake is situated, and/or the State conservation commission *may,* for the protection of the public health, welfare and safety and the conservation of the natural resources of this State, determine and cause to be determined the normal height and level of the waters in such inland lake, and construct and maintain sufficient dams or embankments upon and along the shores and across and through any such lake to keep and maintain the water in such lake at its normal height and level." CL 1948, § 281.102 (Stat Ann 1960 Rev § 11.222). (Emphasis supplied.)

The statute presently in effect provides:

"The conservation department or the board of supervisors of any county in which the whole or any part of the waters of any inland lake is situated, *may* upon its own motion or *shall* by a petition to the board of 2/3 of the freeholders owning lands abutting the lake, for the protection of the public health, welfare and safety and the conservation of the natural resources of this State, or to preserve property values around a lake, cause to be determined the normal height and level of the waters in the inland lake, and construct and maintain sufficient dams to keep and maintain the water in the lake at its normal height and level." PA 1961, No 146, as amended by PA 1962, No 25 (Stat Ann 1965 Cum Supp § 11.300[3]). (Emphasis supplied.)

Both statutes use the permissive term "may" in conferring jurisdiction over inland lake levels. If the legislature intended that the jurisdiction of the boards of supervisors and the conservation department should be exclusive, it would have used language to convey that intention. Since it did not, and since the record of this case does not disclose any action by the enumerated agencies toward the purpose of assuming jurisdiction, we conclude that the lower court had the power to act.

Defendants argue that the court is without jurisdiction to enjoin them from raising the level of the pond above 786 feet because plaintiffs have an adequate remedy at law in the nature of an action for trespass. It is, of course, a familiar principle that equity will not grant relief where there is an adequate remedy at law. *Weinhardt* v. *Addison Community Schools* (1957), 347 Mich 683; *Schantz* v. *Ruehs* (1957), 348 Mich 680; *Sovereign* v. *Sovereign* (1958), 354 Mich 65. It is also true, however, that an "owner of realty is entitled to the aid of equity to prevent permanent and continually recurring injuries to the enjoyment of his property. To deprive him of such enjoyment is to deprive him of the property itself, wholly or to the extent of the mischief." *Koopman* v. *Blodgett* (1888), 70 Mich 610, 618, 619 (14 Am St Rep 527). Also, see *Beaverton Power Co.* v. *Wolverine Power Co.* (1929), 245 Mich 541; *Kraft* v. *Miller* (1946), 314 Mich 390; and *Stone* v. *Roscommon Lumber Co.* (1886), 59 Mich 24.

A case worthy of notice is *Stuart* v. *Detroit Finnish Co-operative Summer Camp Association* (1936), 277 Mich 144. In that case, the defendant owned a spring-fed lake. Plaintiffs, residing on a chain of lakes east of defendant's lake, wished to raise the level of their lakes by means of a dam some two miles distant from defendant's lake. When

the dam was completed, it backed up underground waters which resulted in an overflow of defendant's lake. Plaintiffs sought to enjoin defendant from digging a ditch to reduce the level of its lake because such action would reduce their lakes to their former level. The Supreme Court entered a decree which denied plaintiffs' requested relief and prohibited plaintiffs from raising the water level in their lake to a height which would result in flooding the land surrounding defendant's lake.

Getting back to the case at hand, at the upper end of the pond, north of the peninsula, a dike was constructed. The concrete foundation for the causeway at the end of the dike was imprinted with the date of 1912, indicating that the causeway and probably the dike were constructed at that time. The first conveyance with flowage rights was also made at that time. It is quite obvious that the purpose of the dike was to keep this property west of the dike from being flooded. This hypothesis is reinforced by the fact that in order to reach the north fields, it was necessary to cross the land west of the dike. If the land becomes wet, it also becomes impassable, thus depriving access to the northern fields. Under these circumstances, it would be unreasonable to allow defendant to maintain the level of the pond at a height which would flood the land west of the dike. The clear inference to be drawn from the facts is that at the time of the original conveyance, this land should not be flooded. The lower court concluded that seepage through the dike with the consequent flooding would be alleviated if the level of the pond did not exceed 786 feet.

For the reasons stated, plaintiffs lacked an adequate remedy at law and the granting of the injunction against defendants to prevent flooding does not occasion any great injury to defendants because

there was positive testimony that ample power could be produced with the pond level maintained at 786 feet. The trial court was correct and the injunction proper.

Did the court err in deciding that the only reliable proof that it had before it in determining the water level was the geological survey made by the United States Department of Interior in 1914?

In their brief, defendants argue that the geological survey was improperly considered by the court because it is hearsay evidence. The claim of hearsay was not made in the trial court and therefore the trial judge naturally did not have an opportunity to rule on the question.

"When objections are made to the introduction of evidence during the course of a trial, such objections must be specific and the ground therefor should be stated with perspicuity and particularity in order that it may be understood by the court." *Case* v. *Klute* (1938), 283 Mich 581 (Headnote). See, also, *Hollister* v. *Brown* (1869), 19 Mich 163; *Rayburn* v. *Mason Lumber Co.* (1885), 57 Mich 273; *Abrey* v. *City of Detroit* (1901), 127 Mich 374.

Where the specific objection raised on appeal was not presented to the trial court for decision, it will not be considered by the appellate court. *Brown* v. *Weightman* (1886), 62 Mich 557.

When the survey was admitted it was to be connected up. Turning to the promise to connect the survey, Wigmore has this to say:

"Should the promised connecting evidence fail to be introduced later, the opponent ordinarily must *move to strike out* the original evidence; for he should be vigilant to protect his case, and for lack of such a motion it may be inferred that he has seen no harm to his case by the error."

Wigmore, Evidence (3d ed), § 1871, p 508.

The problem with respect to the level of the pond arose in a manner which can be attributed to the fault of the parties. In the first suit, the question of the water level was litigated and the parties to that suit are bound by the court's determination of 786 feet. The only problem is that Walter and Helen Ellis were not parties to that suit. We are left with the absurd situation where one co-owner is bound and the other is not. Thus, in the second suit, Walter and Helen Ellis were free to raise the question of the water level all over again.

The survey map of 1914 was introduced by plaintiffs in their case in chief, which prompted a discussion as to its admissibility. Later in the trial, the defendants introduced evidence concerning the water level, which was their right to do. Once they reopened the issue of the water level, however, plaintiffs had the right to enter rebuttal evidence on that point.

"Either party is entitled to introduce evidence to rebut that of his adversary, and any competent evidence counteracting or disproving the other party's proof is proper rebuttal. When rebuttal evidence is admitted, it should be applied to any branch of the case or to any alleged facts or theory introduced therein." 22 MLP, Trial § 54.

The admission of rebuttal evidence rests in the sound discretion of the court. *Chamberlain* v. *Detroit Stove Works* (1894), 103 Mich 124; *Gaffka* v. *Grand Trunk Western R. Co.* (1943), 306 Mich 246. The survey map was relevant with respect to two theories of the case. It was properly admitted as bearing on the boundary line. Since the map also related to the water level, the judge properly considered it in rebuttal of defendants' evidence relating to the water level.

We find no error in admitting the survey map to establish the water level.

Did the court err in restraining defendants from raising the pond level above 786 feet for the reason that plaintiffs had knowledge of defendants' right to flow plaintiffs' land?

Defendants' foundation deed from Mary Houser, et al., to William C. Dunn dated June 20, 1912, and recorded the 12th day of January 1914 in liber 134, pages 313, 314, described certain lands including one rod west of the line dividing plaintiffs' and defendants' lands "with right to flow the same with water for power purposes and water privileges." The right to flow said property described was all that was granted and all that defendants own. The establishment of the level of the lake at 786 feet is consistent with the flooding privilege granted to defendants in their contract.

Did the trial court err in not attempting to set the boundary by angular adjustments of known distances as found in the deeds of the parties?

The description of the property conveyed in the subsequent deeds is the source of a large part of the controversy involved in this litigation. It is the contention of the defendant that the boundary line created by said descriptions must be redrawn to conform to natural monuments because it does not close at a double elm tree. The foundation warranty deed dated June 20, 1912 from Mary Houser, Bertha O'Dell, Peter Houser, and Edward White conveyed certain property (now owned by defendant under contract) to William Dunn. The description therein contained is as follows:

"All that part of the northwest quarter of section 32, town 7 south of range 12 west, St. Joseph county, Michigan, lying west of the old mill pond, located thereon, and lying east of the following described

line; beginning 1 chain and 3 links east of the northeast corner of the west half of the northwest quarter of section 32, town 7 south, range 12 west, St. Joseph county, Michigan; thence south 10-1/2 degrees east 7 chains and 70 links, along the westerly side of the retaining dyke; thence east 4 chains and 40 links; thence north 80-1/2 degrees east 2 chains and 68-1/2 links; thence south 44 degrees east 1 chain and 79 links; thence south 83-1/4 degrees east 1 chain and 40 links; thence north 83 degrees east 1 chain and 45 links; thence south 44 degrees east 1 chain and 35-1/2 links; thence south 55 degrees east 1 chain and 50 links; thence south 2-1/2 degrees east 1 chain and 84 links; thence south 68 degrees west 1 chain and 65 links; thence south 61-1/4 degrees west 2 chains and 97 links; thence south 24 degrees west 1 chain and 78 links; thence south 76-1/4 degrees west 1 chain and 7-1/2 links; thence north 82 degrees west 2 chains and 95 links; thence south 83-1/4 degrees west 2 chains and 14 links; thence north 88-1/2 degrees west 2 chains and 35 links; thence south 71-3/4 degrees west 1 chain and 86-1/2 links; thence north 36-1/4 degrees west 1 chain and 33-1/2 links; thence north 27 degrees west 1 chain and 63 links; thence south 45-1/2 degrees west 1 chain and 89 links; thence south 50-1/2 degrees west 2 chains and 34 links; thence south 44-1/2 degrees west 4 chains and 31 links; thence south 15-1/2 degrees west 4 chains and 72 links; thence south 63-3/4 degrees east 2 chains and 58-1/2 links; thence south 11-3/4 degrees east 3 chains and 7 links; thence south 10 degrees west 1 chain and 53-1/2 links; thence south 57 degrees west 1 chain and 45 links; thence north 84-1/2 degrees west 1 chain and 33 links; thence south 29-1/2 degrees east 1 chain and 56 links; thence south 56 degrees east 39 links to *elm tree,* containing 6.20 acres.

"Also a strip of land 1 rod wide, adjoining the westerly side of the afore described tract and extending the entire length of the said westerly side from the section line at the north to the highway at

the south, containing 1.73 acres of land. With right to flow the same with water for power purposes and water privileges."

It is obvious from a careful reading of the controlling description that the monument in controversy was a single "elm tree" and not a "double elm tree."

The first reference in the chain of title to a "double elm tree" is contained in a deed from William Dunn to the Peoples Power & Light Company, dated December 12, 1913. It is this description which evidently caused the confusion.

The purpose of changing a description so as to conform to natural monuments is that these monuments were visible to the parties at the time of the original conveyance and more accurately indicate what was intended to be conveyed. Where the monuments no longer exist, however, the description cannot be changed because there are no monuments to use as guidelines. *Klais v. Danowski* (1964), 373 Mich 262.

The description is free from ambiguity; the surveyor called by defendant was able to follow it precisely, and only encountered difficulty because of the erroneous reference to a double elm tree.

"In the absence of ambiguity, the grantor is presumed to have intended to convey that which he described, and the land conveyed must be controlled by the written description." 7 Callaghan's Michigan Civil Jurisprudence, Deeds of Conveyance § 28, citing *Juif v. State Highway Commissioner* (1938), 287 Mich 35.

We conclude that the property owned by defendants is ascertainable by following the course and distance description and therefore there was no need for the court to construe the description by changing

angles or points to conform to monuments or to determine the description as containing the pond limits plus one rod as was done in this case.

The other issues raised by appellants are not considered because they are unnecessary to a decision.

Judgment insofar as setting water level and granting injunction affirmed. Balance of judgment, reforming deed and setting boundary reversed and remanded for further proceedings consistent with this opinion. Neither side prevailing, no costs are awarded.

BURNS and HOFFIUS, JJ. concurred.