DUCKETT v NORTH DETROIT GENERAL HOSPITAL

Docket No. 30541. Submitted December 12, 1977, at Detroit.—Decided July 5, 1978. Leave to appeal applied for.

Douglas Duckett died on March 3, 1971, at the age of 16, of acute purulent meningitis of the left cerebral hemisphere. Leroy Duckett, individually and as the administrator of the estate of Douglas Duckett, deceased, commenced a wrongful death action against Dr. Yuille and North Detroit General Hospital. During trial, Dr. Yuille settled with the plaintiff for the limit of his insurance coverage. The action against the hospital continued and ended with a verdict and judgment of no cause of action for the defendant, Wayne Circuit Court, Horace W. Gilmore, J. Plaintiff appeals. *Held:*

1. The trial judge committed no reversible error by refusing to permit the plaintiff to read into the record questions put to a witness at a deposition, which a pretrial judge had found objectionable where (1) the plaintiff made no objection at trial or at the deposition, (2) the plaintiff made no offer of proof, and (3) the plaintiff chose to introduce the witness's testimony by way of deposition rather than calling that deponent as an adverse witness whereby plaintiff could have fully cross-examined him.

2. There was no error in the instruction to the jury on proximate cause because, in the context in which it was given, it was fair and did not prejudice the plaintiff and was word for word from the Standard Jury Instructions.

3. The trial court was required to give an instruction requested by the plaintiff on violation by the defendant hospital of rules or regulations promulgated by the State Director of Health pursuant to statutory authority. Failure to give this instruction was reversible error.

Reversed and remanded.

REFERENCES FOR POINTS IN HEADNOTES

[1] 23 Am Jur 2d, Depositions and Discovery § 130 *et seq.*

[2] 75 Am Jur 2d, Trial § 610.

[3] 61 Am Jur 2d, Physicians, Surgeons and Other Healers § 214.
75 Am Jur 2d, Trial §§ 588, 589.

1. EVIDENCE—ADMISSIBILITY OF EVIDENCE—DEPOSITIONS—APPEAL AND
   ERROR.

    A ruling by a trial judge, in a medical malpractice action, that
    certain answers to questions asked by the plaintiff at a deposi-
    tion of a physician were inadmissible was not error where (1)
    the plaintiff chose to present the physician's testimony by way
    of deposition rather than calling him as an adverse witness, (2)
    the plaintiff made no objection to the rulings at trial or at the
    deposition, and (3) the plaintiff made no offer of proof.

2. NEGLIGENCE—PROXIMATE CAUSE—INSTRUCTIONS TO JURY—STAN-
    DARD JURY INSTRUCTIONS—APPEAL AND ERROR.

    A trial judge's instructions to a jury on proximate cause, to which
    a plaintiff objected, in a medical malpractice action, was not
    erroneous where the instruction on proximate cause was word
    for word from the Standard Jury Instructions and a review of
    the entire statement made by the trial judge reveals that in the
    context in which it was given it was fair and did not prejudice
    the plaintiff.

3. NEGLIGENCE—MEDICAL MALPRACTICE—INSTRUCTIONS TO JURY—
    RULE VIOLATIONS—HOSPITALS—CARE OF PHYSICIAN—ADMINIS-
    TRATIVE RULES.

    A trial court, in a medical malpractice action, should have given
    a requested instruction to the jury pertaining to the violation
    by a defendant hospital of a rule or regulation promulgated by
    the state Director of Health pursuant to statutory authority
    where the rule involved was very appropriate to the question of
    negligence (1960 AACS R 325.1027).

*Peter R. Barbara & Associates, P. C.* (by *Peter R. Barbara* and *Frank G. Becker),* for plaintiff.

*Garan, Lucow, Miller, Lehman, Seward & Cooper, P. C.,* for defendant.

Before: N. J. KAUFMAN, P. J., and BRONSON and D. E. HOLBROOK, JJ.

D. E. HOLBROOK, J. After listening to testimony for approximately four weeks in a medical mal-practice case, a Wayne County Circuit Court jury

returned a verdict of no cause of action. Plaintiff appeals as of right.

Plaintiff's deceased son, Douglas Duckett, age 16, died on March 3, 1971, of acute purulent meningitis of the left cerebral hemisphere. The plaintiff sued North Detroit General Hospital and Dr. Yuille, the attending physician, for the wrongful death of his son. During trial, Dr. Yuille settled with the plaintiff for $124,000, the limit of his insurance coverage. Plaintiff continued the trial against the hospital which ended with a verdict of no cause of action.

On February 7, 1971, Douglas Duckett began to complain of headaches. On February 10, 1971, his parents took him to Holy Cross Hospital for an examination. At Holy Cross Hospital, his condition was diagnosed as a cold and he was given a prescription. Douglas took the medication prescribed but his condition did not improve.

On February 12, 1971, Mrs. Duckett took Douglas to Dr. Yuille's office where Douglas told the doctor of his headaches. Dr. Yuille asked him to return on February 18, 1971. After Douglas was examined the second time by Dr. Yuille, he was told that he could go home and would not need to return for further care.

As her son's condition did not improve, Mrs. Duckett called Dr. Yuille's office on February 25, 1971, to seek advice. The receptionist told her that Dr. Yuille was on the staff of North Detroit General Hospital and Douglas could be taken directly there. Mr. Duckett took Douglas to the hospital and arrived at the emergency room at 10:50 a.m. on February 25, 1971.

Dr. Pinna saw Douglas in the emergency room. He ordered a spinal tap and a chemical and miscroscopic analysis of the spinal fluid as well as a

culture and sensitivity analysis of the purulent discharge from the left nostril. Dr. Pinna stated that the spinal tap did not indicate anything specific. The culture and sensitivity analysis of the purulent discharge from the left nostril was never done. Also, an electronencephalographic test, which was ordered by Dr. Yuille on February 26, was not performed.

Dr. Fogt relieved Dr. Pinna at 1 p.m. and ordered that chest X-rays be taken. Douglas was formally admitted to the hospital at 2:10 p.m. based on the unknown origin of the headaches. Dr Yuille was contacted and agreed to the admission. Upon his admission, Douglas was given pain medication. Following his admission, Douglas was not seen by another doctor until the next day, February 26, 1971. On February 26, 1971, Dr. Quiambao took the admission history and performed a routine physical examination of Douglas. He made an admitting diagnosis of cephalgia, frontal sinusitis left, possible meningitis pneumococcus. Dr. Quiambao testified that Douglas's complaint of stiffness of the neck and headaches led him to believe that meningitis may be involved. Douglas received further pain medication on February 26 and 27.

On February 28, 1971, Dr. Yuille ordered, via the telephone, an intravenous solution of penicillin and also stated that Douglas was to receive percodan every four hours as needed. The penicillin was not administered until 5 p.m. and the only percodan administered was at 5:45 p.m. The hospital records do not indicate that Douglas was seen by a physician on February 27 or 28.

On March 1, 1971, Dr. Yuille visited Douglas at 12:30 p.m. and at 1:45 p.m. he had him placed in isolation. On March 2, while Douglas remained in isolation, he was under the care of a registered

nurse. The nurse became concerned about Douglas's condition and notified the cardiac arrest team at 2:50 a.m. Dr. Yuille and the Duckett family were notified of Douglas's deteriorating condition. Douglas remained in critical condition until he died at 4:24 p.m. on March 3.

Dr. Carl Maier, an expert in emergency room medicine, testified on behalf of the plaintiff. Dr. Maier had developed a program for providing regular physician services for various hospitals in the Cleveland area. In his opinion, the diagnosis and treatment of meningitis and sinusitis would be the same both for Detroit and Cleveland. He testified that the standard practice was for one emergency room physician to remain responsible for the care, diagnosis and treatment of emergency room patients until the patient's own physician arrived to take charge of the patient. He also testified that the standard practice required the house physician to care and treat an admitted emergency room patient when the only contact with the attending family phyisican was a phone call to the emergency room doctor. He testified that the in-house physician had a duty to see the patient within an hour or two of having arrived on the ward to evaluate what had been done, to conduct an independent history and physical examination and achieve an independent diagnosis. This diagnosis should then be given to the attending physician. Dr. Maier also testified that nurses had a duty to contact the patient's personal physician or their supervisor if they detect a problem in the patient's health care. Based upon a review of the pertinent medical records, Dr. Maier testified that the care rendered to Douglas Duckett was below the standard of care required for patients similarly situated at the time. According to Dr.

Maier, the care received by Douglas during his
hospitalization at the defendant hospital was be-
low that required for patients being admitted for a
similar type problem. The breaches of the stan-
dard of care specified by Dr. Maier included a
failure to obtain a proper history from the patient;
the failure to order sufficient diagnostic testing in
the emergency room; the division of treatment
between various doctors; failure to institute antibi-
otic treatment prior to 5 p.m. on February 28,
1971, and the failure of the nursing staff to alert
their superiors or doctors as to the deterioration in
the plaintiff's condition.

Dr. Maier testified that the proximity of the
sinus cavity to the venous drainage into the brain
enables the infection to directly affect the brain.
Consequently, the sinusitis could have been trans-
ported to the left side of the brain and established
bacterial meningitis. Given the nature of the infec-
tion afflicting Douglas Duckett, he testified that
massive therapy using multiple antibiotic drugs
via intravenous route should have been adminis-
tered immediately. He testified that the pain medi-
cation given to Douglas before 5 p.m. on February
28, 1971, had no treating affect on the infectious
process. He testified that if proper care would have
been given to Douglas, in his opinion, Douglas
would not have died. He further testified that the
defendant hospital would be more competent to
handle the care of Douglas than the attending
physician.

The trial judge was not going to let Dr. Maier
testify as to the local standard of care in Detroit
hospitals because Dr. Maier was from Cleveland.
However, after Dr. Maier consulted with Dr.
Krome, the director of the emergency department
at Detroit General Hospital, the court allowed Dr.

Maier to testify. The qualifications for his testimony were based on his conversation with Dr. Krome as to the standards of care in Detroit.

Dr. Krome testified for the defendant and disputed Dr. Maier's interpretation of their conference. He testified generally that there was no breach of the standard of care in this case on the part of North Detroit General Hospital.

The first issue raised by plaintiff merits no discussion.

The second issue plaintiff raises on appeal is whether the trial judge erred in sustaining the decision of the pretrial judge as to the inadmissibility of certain answers to questions asked by the plaintiff at a deposition of a physician.

The plaintiff asserts that the pretrial judge's decisions, sustained by the trial judge, unfairly restricted his right to cross-examine adverse witnesses and constitutes reversible error.

On July 29, 1975, plaintiff took a second deposition from Dr. Alshab, during which defendant objected to some questions asked by plaintiff. The pretrial judge ruled on the various objections and ruled that some of the questions were improper and therefore Dr. Alshab was not to answer them. At trial, plaintiff chose to present Dr. Alshab's testimony by way of deposition rather than calling him as an adverse witness. The trial judge did not permit plaintiff to read into the record those questions which the pretrial judge had found objectionable.

Plaintiff's position is untenable. First, since he made no objection at trial or at the deposition, he cannot now raise the issue as reversible error. *Arnold v Ellis,* 5 Mich App 101; 145 NW2d 822 (1966). Second, since plaintiff made no offer of proof he cannot assert that the defendant's objec-

tions were improperly sustained. GCR 1963, 604, *Illenden v Illenden,* 46 Mich App 710, 714; 208 NW2d 565 (1973), *lv den,* 390 Mich 783 (1973). Third, if plaintiff wished to fully cross-examine Dr. Alshab, plaintiff could have called him as a witness at trial, but this he did not do. Thus, plaintiff's second issue is without merit.

Next, the plaintiff maintains that the trial judge improperly deviated from the Standard Jury Instructions on the question of proximate cause and thus committed reversible error.

The trial judge gave the following instruction:

"Now what do I mean when I talk about proximate cause? Proximate cause is not in any way a complicated concept of law. When I sue *[sic]* the words 'proximate cause,' I mean first, that there must have been a connection between the conduct of the defendant which the plaintiff claims was negligent and the injury complained of or the death of the decedent, and second, that the occurrence which is claimed to have produced the injury was a natural and probable result of such conduct. In other words, proximate cause is not complicated. Negligence in a vacuum means nothing. Before negligence can be actionable, negligence must, number one, be in fact a cause of death, and second, the death, the injury here, must have naturally and proximately flowed from the negligence. And that is all we mean when we talk about proximate cause.

"Now there may be more than one proximate cause. And to be a proximate cause, the claimed negligence of the defendant hospital need not be the only cause nor the last cause. A cause may be proximate although it and another cause act at the same time or in combination to produce the occurrence.

\*   \*   \*

"Now if you decide that the Defendant North Detroit General Hospital was negligent and that such negligence was a proximate cause of the death of Douglas Duckett, it is not a defense that the conduct of Doctor

Yuille, who is no longer a party, may have also caused the occurrence. In other words, if you decide North Detroit General Was *[sic]* negligent and that negligence was a proximate cause, it is not a defense that the conduct of Doctor Yuille was also a proximate cause.

"However, if you decide that the only proximate cause was the conduct of Doctor Yuille and not the North Detroit General Hospital, then your verdict should be for the defendants."

The plaintiff asserts that these instructions constitute error inasmuch as SJI 15.01 is the proper instruction on proximate cause and the instruction previously quoted expanded the proximate cause instruction and prejudiced the plaintiff. We do not agree.

The Standard Jury Instruction on proximate cause is as follows:

"When I use the words 'proximate cause' I mean first, that there must have been a connection between that conduct of the defendant which plaintiff claims was negligent and the injury complained of by the plaintiff, and second, that the occurrence which is claimed to have produced that injury was a natural and probable result of such conduct of the defendant."

The trial judge's instruction was word for word from the Standard Jury Instructions. We have reviewed the entire statement made by the judge to which plaintiff objects and find that in the context in which it was given, it was fair and did not prejudice the plaintiff. We find no error.

The last issue plaintiff raises on appeal is whether the trial court committed reversible error when it refused to read certain rules and regulations to the jury. The plaintiff asserts that the rules and regulations which plaintiff requested that the trial court read to the jury pertained to

the duties owed by the hospital to its patients and thus the trial court committed reversible error in failing to read them. The defendant maintains that these rules and regulations requested by plaintiff were not pertinent to the instant case so no error was committed.

Plaintiff requested that the trial court give SJI 12.07—Violation by Defendant of Rules or Regulations Promulgated Pursuant to Statutory Authority. The State Director of Health has adopted certain regulations pursuant to authority given him by state statute. Rule 7.1 adopted by the State Director of Health provides that: "All persons admitted to a hospital shall be under the continuing daily care of a physician licensed to practice in Michigan." 1960 AACS R 325.1027. Further, the plaintiff requested the following instruction:

"If you find that the Defendant Hospital violated one or more of these rules or regulations before or at the time of the occurrence, such violations are evidence of negligence which you should consider, together with all the other evidence, in deciding whether defendant was negligent. If you find that said defendant was negligent, you must decide whether such negligence was a proximate cause of the injuries and damages to plaintiffs."

The trial court instructed the jury as follows:

"Now the State of Michigan has adopted, and let me elaborate a little bit on what I have said here, the State of Michigan has adopted a statute or a law which is applicable to hospitals which says the governing body of each hospital shall be responsible for the operation of the hospital and for the qualify [sic] of care rendered in the hospital."

The instruction that the trial court gave was proper but we rule that the trial court was re-

quired to give requested SJI 12.07. The reading of the whole statute authorizing promulgation of rules by the State Director of Health was not necessary.

We do not agree with defendant that Rule 7.1 is inappropriate under the facts of the instant case. The hospital records indicate that no doctor saw Douglas on February 27 and 28 while he was a patient at the hospital. Thus, the rule which requires a hospital to provide a patient with the continuing daily care of a physician is very appropriate to the question of negligence.

Defendant maintains Rule 7.1 applies only to a patient accepted by the hospital who has no physician of his own and that the rule does not apply where the patient's physician has staff privileges at the hospital. For us to adopt this argument would discourage hospitals from checking their patients daily to assure that proper medical treatment is being provided to the patient. Rule 7.1 states: "All persons admitted to a hospital shall be under the continuing daily care of a physician licensed to practice in Michigan." Rule 7.1 does not create an undue burden on the hospital. Such attention by a hospital would help to assure that a patient is receiving proper medical care.

We have considered the issues raised by defendant in cross-appeal and find them to be without merit.

Reversed and remanded for a new trial. Costs to plaintiff.