PEOPLE v. ROGULSKI.

1. CRIMINAL LAW—TRIAL—INSTRUCTIONS—PRESUMPTION OF INNOCENCE.

In a prosecution for murder, the respondent is presumed to be innocent until the presumption is overcome by testimony which establishes his guilt beyond a reasonable doubt; and it is the duty of the trial court to so instruct the jury, in substance, or in exact words, if the respondent so requests.

2. SAME—BURDEN OF PROOF—EVIDENCE.

Where the trial court directed a verdict for respondent, on the questions of murder and voluntary manslaughter, leaving to them the question of involuntary manslaughter, assault and battery or assault, under the information, and he instructed the jury that there was no presumption that respondent committed manslaughter unless the crime was proved, and the burden of proof was on the prosecution to show, beyond a reasonable doubt, that the respondent was guilty, and that defendant was entitled to every reasonable doubt, cautioning the jury at length as to this phase of the case, the court did not commit error, in the absence of a request for more specific instructions as to the presumption of innocence.

181 Mich.—31.

3. SAME—HOMICIDE—INVOLUNTARY MANSLAUGHTER.

Respondent was charged with murder. The evidence showed that he killed the victim, a young man who was hunting and trespassing on a farm; that respondent had been offered a sum of money for every gun which he should bring in, by an employee of the owner of the premises; that he attempted to take the gun from decedent who tried to recover it and was shot, some of the testimony tending to prove that respondent purposely fired the weapon. The court did not submit the murder charge to the jury, or permit them to find that respondent was guilty of voluntary manslaughter, but charged the jury that they might find him guilty of involuntary manslaughter or the lesser offenses included in such charge. *Held*, that no error was committed in charging that he had no legal right to take the gun from the boys, and if he was in the act of taking the gun from the boys when he shot decedent, even accidentally, he was guilty of involuntary manslaughter.

4. SAME—EVIDENCE.

If the jury found that respondent obtained possession of the gun either by a ruse or by violence, with the wrongful intention to permanently deprive the owner of it and convert it to his own use or deliver it to another for a reward, his act amounted to larceny, if not robbery. If he intentionally but without malice aimed or pointed the gun at decedent, designing no mischief, and by its discharge death resulted, he was guilty of a careless use of firearms in violation of statute and the offense was manslaughter. 3 Comp. Laws, § 11511 (5 How. Stat. [2d Ed.] § 14560). Also, negligence in the use of firearms may, at common law, render the possessor liable to a charge of manslaughter.

5. SAME—INFORMATION.

Under the short form of information for murder, a conviction for involuntary manslaughter was not unauthorized.

Error to Wayne; Van Zile, J. Submitted April 23, 1914. (Docket No. 170.) Decided July 24, 1914.

Stephen Rogulski was convicted of manslaughter. Affirmed.

*Hugh Shepherd,* Prosecuting Attorney, *George A. Kelly,* Assistant Prosecuting Attorney, *Grant Fellows,* Attorney General, and *Samuel D. Pepper,* Assistant Attorney General, for the people.

*Thomas J. Mahon* and *Thomas · W. Thompson,* for respondent.

STEERE, J. Respondent was convicted of the crime of manslaughter in the circuit court of Wayne county, on February 18, 1913, under an information for murder which, in simple form under section 11912, 3 Comp. Laws (5 How. Stat. [2d Ed.] § 15083), charged in one count that:

Respondent "on the 29th day of December, in A. D. 1912, at said township of Dearborn in said county, feloniously, wilfully, and of his malice aforethought, did kill and murder one Walter Dahlman, contrary to the form of the statute in such case made and provided and against the peace and dignity of the people of the State of Michigan."

The errors assigned in respondent's bill of exceptions and relied upon relate entirely to the charge of the court. They are stated by his counsel in their brief as follows:

"It is contended that the court committed grievous error in failing to charge that respondent was entitled to the presumption of innocence; that the court erred in permitting the jury to find the respondent guilty if death ensued as a result of the careless use of firearms; and in permitting the jury to find that respondent in 'the keeping of the gun and the carrying of it' would be guilty of an unlawful act such as would make him guilty of manslaughter in an accidental discharge of the gun."

It is undisputed that Dahlman was killed, at the time and place alleged, by a shot fired from a gun held in respondent's hands. It was claimed on the part of the defense that the shooting was unintentional, in which view the prosecution and court apparently

acquiesced, and the court instructed the jury that respondent could not be convicted of either murder or voluntary manslaughter under the testimony, but might be convicted of involuntary manslaughter, or "assault and battery, or even an assault." The record shows respondent was found "guilty of manslaughter" —whether voluntary or involuntary is not stated. He was sentenced to serve not less than two years and not more than five years at Jackson State prison.

On the trial six witnesses were sworn by the prosecution, two companions of Dahlman named Leitz and Woitha, Dr. Bell, who examined the body of Dahlman in the morgue, a game warden named Daniel, and two men named Bryant and McDonald, employees of Henry Ford, owner of the demense upon which the shooting occurred; the three last named having come upon the scene shortly after the shooting, while his companions were carrying away Dahlman's remains.

No testimony was introduced or offered by the defense.

Defendant was in Ford's employ. The nature of his employment is not shown. The only testimony relative to his employment is that of Bryant, who testifies:

"He was working for the Ford people at the time of the shooting. * * * He started to work for Ford about three weeks before the shooting. I knew nothing about the man before he started to work for us."

On the morning of this tragedy, Dahlman and his two companions went out from Detroit to Dearborn together, taking with them a single-barreled shotgun belonging to Dahlman. They were friends and neighbors living in Detroit. Leitz was 20 years old. The ages of the others are not given. Leitz and Woitha worked in factories in Detroit. The record gives no information as to deceased's avocation, age, or size. They are called boys by witnesses and the court.

They purposed to and did call upon a family named Jubs, living near Dearborn, where Leitz was acquainted. They asked for George Jubs, apparently a younger member of that family, who was not at home. The three then left their coats in the Jubs barn, walked together across a field towards the River Rouge carrying Dahlman's gun, and on the way they fired it two or three times at a mark. In their rambling they crossed the river when one of them saw a field mouse run under a brush, and they all then devoted themselves to trying to find and get it. While they were so engaged, respondent came up and greeted them, asking what they were looking for. Having been informed, he in apparent good nature joined in the hunt for a few minutes, and finally inquired the kind and name of the gun they had, which at that time Leitz was carrying. Leitz, in response, said he did not know, but would tell as soon as he looked, and just as he was giving the information respondent took the gun from his hands. Of what then occurred Leitz testifies:

"Just as I said that he pulled the gun out of my hands. Then he says to the three of us, 'Now you will have to come along with me.' I says to him, 'What is the matter?' He says, 'Never mind, you will have to come along with me.' Just as he says that, Walter stepped, made a kind of step, and says, 'Please Mister, give me my gun.' Just when he said that he fired and killed him. * * * After Walter was shot, he says, 'I am shot,' and he fell. Rogulski then walked away without looking at the boy who was shot. He had the gun with him and walked up the hill. When Walter fell and Rogulski started up the hill, we ran about 20 yards or so from the River Rouge. Before we ran I looked around and saw a man standing up on the hill about 500 yards away. I could not tell whether he had a gun or not. While running I heard a shot. Where the shot came from I could not tell. It sounded as though it came from above the hill. * * * Al Woitha stayed in the center of the field,

and I went back to the house and asked Mr. Jubs to come along with me. I told him that my friend was shot. * * * He said he was sick so he could not go along with me. I asked him if it would be safe for me to go across and get him. He says yes, he thought it would be all right. So we both went across and got Walter, my friend Al and myself. We found him lying on his face where he fell. He was shot just below the heart and was dead. We picked him up and carried him across the Rouge."

In its general outlines Woitha's testimony as to what occurred is substantially the same as Leitz's, though he does not appear to be as intelligent a witness.

They were the only eyewitnesses who testified, and were closely questioned as to respondent's manner of holding and handling the gun at or about the time it was discharged. Witness Daniel testified that one of them, in detailing the occurrence later, said the gun was cocked when respondent took it, and that it was handed to him. Leitz testified that the gun was not cocked while he was carrying it, that he did not know how it was when respondent took it, and he did not subsequently say that it was cocked when he gave it to respondent, who "grabbed it just like that, right in between me. Q. In between your hands he put his hands? A. Yes." When asked how respondent was carrying the gun, he replied:

"He was carrying it this way (indicating).
"Q. Meaning the barrel pointed up?
"A. The barrel pointed at us, sir."

Woitha testifies:

"I was looking for the field mouse, and I see him take the gun. * * * The gun was hanging down towards the ground. When he fired it he held it straight, under his arm, with one hand on it, and he was facing Walter. Walter cried, 'I am shot, shot,' and fell right down. * * * I don't know whether Mr. Leitz gave him the gun or whether Rogulski took

it. I saw Rogulski take the gun away from Dahlman. Rogulski was moving off backward when I saw him. * * * Rogulski said nothing, none of us had hold of the gun. He raised the gun with one hand; his left hand hanging by his side. Then the gun went off, Walter fell crying 'I am shot.' "

Respondent took the gun to witness McDonald and told him "that somebody had been shot." McDonald telephoned to Bryant, and they together visited the scene of the shooting. They found tracks and blood marks which they followed up until they found the dead body of Dahlman. Looking around, they saw Leitz and Woitha, running away through a field. Upon being called, they went back. Bryant testifies:

"The fact that their friend was dead did not seem to bother them a great deal. They talked to me in a perfectly calm manner and related, I presume, the whole incident."

McDonald testifies:

"The boys seemed pretty well frightened, highly excited and very nervous."

Daniel, the game warden, who had been notified by telephone, also came upon the scene and examined the body. He testified that the wound was about the size of a quarter of a dollar, on the left side under the nipple. Dr. Bell testified to death by a gunshot wound, to the right of the left nipple, which probably a quarter would cover; the wound missing the heart, ranging from front backward and slightly upward.

It is contended that the court committed prejudicial error in failing to charge that respondent is entitled to the presumption of innocence. It must be conceded a well-settled rule of law in criminal prosecutions that the defendant is presumed innocent until that presumption is overcome by testimony establishing the contrary beyond a reasonable doubt, and that it is the duty of the court to so instruct the jury in sub-

stance, or in exact words if so requested. Respondent did not present any requests upon that subject, and the court did not so charge in exact language. In support of their contention that this is reversible error, counsel for respondent cite *People* v. *De Fore*, 64 Mich. 693 (31 N. W. 585, 8 Am. St. Rep. 863), and the late case of *People* v. *Karamol*, 173 Mich. 354 (139 N. W. 1). The charge of the court contains much strong language cautioning the jury as to the burden of proof and rights of respondent, in that connection even taking from the jury, and directing a verdict for respondent on, all questions of murder in either degree and voluntary manslaughter, impressing upon them, we think, by the directions given and substance of the language used the thought embodied in the rule of presumption of innocence, saying:

"There is no presumption that there was manslaughter committed on the part of the defendant, unless it has been proved, and the burden of the proof is that the people must show beyond a reasonable doubt that the defendant is guilty of the offense charged, or of the lesser offense that you may find him guilty of. * * * If your minds then, after considering all the testimony in the case, are in such a condition that you cannot say to a moral certainty that the defendant is guilty, a reasonable doubt exists in your minds, and you should acquit him. * * * He is here simply as the defendant, and it is the duty of the prosecution to prove him guilty beyond a reasonable doubt. * * * Now, it is for you gentlemen to say. In determining these questions, and in weighing all this evidence, the defendant is entitled to every reasonable doubt as I have already said. And should you find in this case that there is a reasonable doubt as to whether this defendant was at that time engaged in this unlawful act, and the shooting was the result of the unlawful act, if there is a reasonable doubt as to that, then you should find for the defendant, not guilty."

It cannot be said here, as in *People* v. *De Fore*, *supra*, that:

"The charge of the court entirely overlooks this presumption and nothing was said upon the subject."

In *People* v. *Karamol, supra,* respondent directly presented a request in writing that the court charge:

"In this case, as in all criminal cases, the defendant is presumed, or held, to be innocent until he is proved guilty, and, before a conviction can be had, he must be proved guilty beyond a reasonable doubt. He is not called upon to prove his innocence; that being presumed without proof."

This was refused. It was held that the charge as given was not the equivalent of the request, and, counsel having especially made the request in writing, it was error to refuse it. We conclude that under the situation presented here, in the absence of any request upon that subject, the charge is sufficient and can be sustained by previous decisions of this court. *People* v. *Graney,* 91 Mich. 646 (52 N. W. 66); *People* v. *Smith,* 92 Mich. 10 (52 N. W. 67); *People* v. *McWhorter,* 93 Mich. 641 (53 N. W. 780); *People* v. *Ostrander,* 110 Mich. 60 (67 N. W. 1079). In the latter case it is said:

"It is next argued that the court neglected to charge the jury as to the presumption of innocence. The attention of the court was not called to this point. The court, however, did very fully instruct the jury that they must be convinced, by the evidence, of the guilt of the accused, beyond any reasonable doubt. This point is ruled by *People* v. *Graney,* 91 Mich. 646 [52 N. W. 66]; *People* v. *Smith,* 92 Mich. 10 [52 N. W. 67]."

Counsel for the defense state in their brief:

"Respondent was caretaker of the Ford farm at Dearborn, in Wayne county. Many trespassers had been accustomed to invade the farm and shoot there regardless of notices posted thereon forbidding such conduct."

We find no evidence in the record supporting either

of these statements. Bryant does testify that "on this farm is posted 'No shooting allowed on private property,'" and the only evidence of what property Dahlman was killed on is that of Leitz, who on cross-examination said:

"I did not know whether I was on private property when I got across the river, and I did not shoot after I crossed the river. I know now that the property we were on is Ford's farm."

We have already stated all that is disclosed of respondent's employment and duties. We find no evidence in the record of any person or persons trespassing and shooting upon the Ford farm before the day in question, beyond a remote inference from the testimony of Bryant that once, in a conversation with respondent regarding people hunting on the premises, he promised respondent "a bushel of corn or something similar for every gun that he brought in. * * * He wanted to buy oats and hay for his horse, and the question came up in a joking way, and I told him I would give him five bushels of oats." And McDonald's testimony that Rogulski told him an inspector offered him $5 for getting a gun, and he went after it. It is claimed in his behalf that a desire to obtain the offered reward made respondent especially anxious to get possession of this gun, and when, having secured it, he was in the act of carrying it away, it was accidentally discharged. The court submitted this theory to the jury and said:

"The prosecution claims he was there for the purpose of getting this gun, and that he desired to get hold of this gun for the purpose of exchanging it for a prize that he understood had been offered him for guns that he might collect; that Mr. Ford, the owner of the farm, and his tenants had given out that he would not allow any hunting or shooting upon the farm, and this was one of the means, as it is claimed by the prosecution, that the defendant understood

they were taking to prohibit and to avoid having shooting upon the place.  *  *  * "

The court also said:

"And so, the whole matter more or less rests upon this particular situation.  On this occasion was this a friendly conversation that they were having?  Was it entirely agreed to upon the part of the young man and the defendant?  Or if, on the occasion in question, he was raising that gun up for the purpose of giving it back to the boys, as has been suggested by counsel, and, in such case, he would not be guilty."

We find scant evidence in the record to support such a theory.  On the contrary, the only witnesses to the transaction testify unequivocally that, after securing possession of the gun, either by a ruse or forcibly taking it, respondent, facing them, ordered them to "come along with me," repeating the order when they hesitated and inquired what was the matter, and, when deceased made the step and asked for his gun, shot him dead, accidentally it is said and found by the jury under direction of the court.

Under the circumstances shown, the question of accidental shooting might well be urged as an issue for the jury.  It is undisputed that respondent stood facing deceased and his companions, clear of them, untouched by them, suddenly at variance with them, holding the gun in his hand pointed towards them, and practically at the heart of deceased when it was discharged; and that it was discharged by some act of his there can be no question—guns do not discharge themselves.  In support of a theory that this gun was unusually liable to accidental discharge, the testimony of Daniel that it was a cheap gun, not made of good steel, liable to explode, and he would not use it for $50, is urged.  The fact that it might be more liable to explode, or burst, when discharged, than some other guns, has no tendency to support such theory.  It did not burst; it was simply discharged.  There is no evi-

dence it was out of order in any way, nor whether the trigger pull was light or heavy.

Assuming, as his counsel urge, that respondent was caretaker of the property on which he found these boys trespassing and on which he had heard them shooting, that it was his duty to prevent trespassing, that persons had frequently before ignored notices and invaded those premises to shoot there, and in the performance of his duties he went where they were either to drive away or arrest them, it further appearing that when he took their gun and ordered them to go with him, repeating it and they did not obey, deceased at the same time indicating a disposition to repossess himself of the gun, it could well be argued that such facts tended to rouse a hostile impulse, ill feeling, and motive on his part toward deceased resulting in his intentionally using the weapon. It is due to the court to state that the apparent invasion of the province of the jury in instructing them as a matter of fact that respondent fired the shot accidentally was approved by the prosecution.

In submitting the question of involuntary manslaughter to the jury, the court instructed them that if respondent was at the time engaged in an unlawful act, not amounting to a felony, which resulted in the killing, even though death was not intended, he would be guilty of manslaughter, saying among other things:

"Now, I charge you that this man had no business, he had no legal right, to take this gun from these boys. It was a matter that it was not for him to correct, if they were there even as trespassers upon that farm; that even Mr. Ford himself, who was the owner of the place, and had he forbidden persons to go upon that farm and do shooting, would have no right to go down there and take this boy's property from him, and if he did that by force he would be engaged in an unlawful act. And so, in this case, if this man went there for the purpose of taking this gun away from

these boys, and he was in the act of taking the gun from them, against their will, taking it way from them, and in the taking it away from them and in the keeping of it and in the carrying of it he even accidentally shot this boy, he is guilty of involuntry manslaughter."

It is claimed by respondent that this portion of the charge is erroneous on two grounds: *First,* that under the single, short count of the information filed in this case charging murder a conviction for involuntary manslaughter cannot be had; *second,* because the court erroneously said to the jury that respondent had no business to take the gun from the boys, and he would be guilty of involuntary manslaughter if he accidentally shot the boy while keeping and carrying away the gun. Such excerpts from the charge must be considered in connection with the evidence in the case and the charge taken as a whole. So considered, we cannot regard them as misleading. The evidence was plain and conclusive that the shooting immediately followed respondent's taking the gun from Leitz, he had not separated from them, but had just stepped back three or four feet, and, facing the three boys, ordered them to come along with him. The entire transaction covered but a very short space of time.

If the evidence showed that respondent obtained possession of this gun from Leitz either by a ruse or by violence, with a wrongful intention to permanently deprive the owner of it and convert it to his own use, by delivering it to Bryant for a reward, or otherwise, his acts would amount in effect to larceny, if not to robbery. If he intentionally but without malice aimed or pointed the gun at Dahlman designing no mischief, but by its discharge death resulted, he was guilty of a careless use of firearms in violation of the statute upon that subject, and the offense was manslaughter. Section 11511, 3 Comp. Laws (5 How. Stat. [2d Ed.]

§ 14560). Aside from this, it is a general principle of the common law that any one in possession of and using a dangerous agency, particularly firearms, must observe all reasonable caution, and, if by his failure to do so and negligent use of the same, death results, he may be convicted of manslaughter. Taken as a whole, we think the charge of the court was very moderate and extremely favorable to the accused.

In support of the contention that respondent could not be convicted of involuntary manslaughter under the statutory, short form information for murder, counsel cite Wharton on Homicide, p. 876, and *People* v. *Olmstead,* 30 Mich. 431. Our statutes do not recognize grades or degrees of manslaughter, they neither define nor grade it. There is but one offense of manslaughter in this State. *Tyler* v. *People,* 8 Mich. 320. While in the discussion of that offense voluntary and involuntary manslaughter are often reviewed and the distinctions pointed out for a better understanding of what homicide may amount to manslaughter, and the formal charge and conviction, there is no legal classification or distinction in this State. The jury in this case rendered a plain verdict of "manslaughter." Adjectives would have been surplusage.

It has been held in only a special class of statutory offenses involving consequential homicide, not directly resulting from assaults or acts of violence (such as administering drugs for unlawful purposes), that the peculiar facts of the offense must be more fully charged than in the statutory information. *People* v. *Olmstead, supra; People* v. *Aikin,* 66 Mich. 460 (33 N. W. 821, 11 Am. St. Rep. 512). The principle there involved and reason stated therefor being that an innocent person charged under the short form of information would not be sufficiently advised by it of the peculiar and special circumstances necessary to be proven in that class of cases to understandingly

prepare to meet them; but in that connection it is said that he can be "fairly assumed bound to prepare himself to meet a charge of manslaughter by direct violence or assault." This subject is further elucidated in *People* v. *Stubenvoll*, 62 Mich. 329 (28 N. W. 883), and *People* v. *Sauer*, 143 Mich. 308 (106 N. W. 866). In the latter case respondent was charged with the murder of an officer, acting under a writ of replevin, and claimed that his gun was accidentally discharged while he was trying to frighten deceased off from the premises. This conviction of manslaughter was sustained under a statutory information for murder, which an examination of the original record discloses was practically the same as that used here.

We think the information was sufficient to sustain the verdict and find no reversible error in the case.

The conviction and judgment of sentence are affirmed.

McALVAY, C. J., and BROOKE, KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.