PEOPLE v. MYERS

1. HOMICIDE — MANSLAUGHTER — PRELIMINARY EXAMINATION — PROBABLE CAUSE.

   Probable cause existed to charge defendant with manslaughter in the death of her three-year-old stepdaughter where the evidence showed that defendant had drawn hot water into a tub, had placed or requested the deceased, her identical twin sister, and two older stepdaughters to get into the tub, had permitted the two older children, but not the twins, to get out when they complained that it was too hot and, then ran additional hot water into the tub, which resulted in 55 percent of the deceased's body being burned and caused the deceased's death.

2. HOMICIDE—CRIMINAL LAW—MANSLAUGHTER—PRELIMINARY EXAM- INATION—PROBABLE CAUSE.

   Probable cause existed to bind the defendant over to the circuit court on a charge of manslaughter for the death of her three-

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2]  21 Am Jur 2d, Criminal Law § 443.
[3, 4]  40 Am Jur 2d, Homicide § 54.
[5]  40 Am Jur 2d, Homicide § 55.
[5, 6]  41 Am Jur 2d, Indictments and Informations §§ 86–103.
[6, 7]  40 Am Jur 2d, Homicide § 216.
[8]  29 Am Jur 2d, Evidence § 783.
[9, 10]  29 Am Jur 2d, Evidence § 787.
[11, 12]  29 Am Jur 2d, Evidence § 790.
   Authentication or verification of photograph as basis for introduction in evidence. 9 ALR2d 899.
[13]  29 Am Jur 2d, Evidence §§ 249, 251–257, 267.
[14]  30 Am Jur 2d, Evidence § 1080.
   40 Am Jur 2d, Homicide § 425.

year-old stepdaughter where the stepdaughter and older sisters had been placed in a bathtub by the defendant, the older children after complaining that the water was too hot were allowed to get out of the bathtub, the defendant then placed additional hot water in the tub, and evidence showed trauma to the deceased's neck and cheek and the deceased died as a result of the assault.

3. HOMICIDE—MANSLAUGHTER—DEFINITION.
Manslaughter is defined as the unlawful killing of another without malice, express or implied.

4. HOMICIDE — MANSLAUGHTER — VOLUNTARY MANSLAUGHTER — DEFINITION.
Manslaughter, when voluntary, arises from a sudden heat of passion, without malice or premeditation, and as the result of temporary excitement by which the control of reason was disturbed, rather than from any wickedness of heart or cruelty or reckless disposition.

5. INDICTMENT AND INFORMATION—MANSLAUGHTER BY ASSAULT—INVOLUNTARY MANSLAUGHTER—SHORT-FORM INFORMATION.
Manslaughter by assault may be charged under the statutory short-form information and may constitute involuntary manslaughter, because the statutes of this state neither recognize nor define grades or degrees of manslaughter.

6. INDICTMENT AND INFORMATION—INVOLUNTARY MANSLAUGHTER—DEATH FROM ASSAULT.
A charge of death from assault is sufficient to charge involuntary manslaughter, because there is no distinction between voluntary and involuntary manslaughter for any purpose except that of the pleading of negligent and statutory homicide.

7. CRIMINAL LAW—TRIAL—COUNSEL'S EXPLANATION OF LAW—MANSLAUGHTER.
Ruling that defense counsel in a voluntary manslaughter case could not tell the jury what the law was in his opening statement was error, but not reversible error, where counsel argued intent, voluntary manslaughter, and later pointed out that a verdict of not guilty must be returned if the jury found the killing to be accidental or because of negligence.

8. EVIDENCE—PHOTOGRAPHS—ADMISSIBILITY—PROBATIVE VALUE.
Photographic evidence relative to a material point may be admissible if its probative value outweighs its possible prejudicial effects.

9. EVIDENCE—PHOTOGRAPHS—ADMISSIBILITY—GRUESOMENESS.

Gruesomeness alone does not render photographs inadmissible.

10. EVIDENCE — PHOTOGRAPHS — ADMISSIBILITY — INFLAMMATORY PHOTOGRAPHS.

The trial court abuses its discretion in admitting an inflammatory photograph, when it is objected to, without requiring the people to lay a predicate that the issue or issues to be proven could not be effectively proven with evidence less potentially prejudicial.

11. HOMICIDE—MANSLAUGHTER—EVIDENCE—PHOTOGRAPHS.

Photograph of three-year-old homicide victim who died as a result of defendant's putting and keeping her in a tub of hot water showing hot-water burns over 55 percent of the victim's body was admissible where it had definite probative value by showing the defendant's intent in having the deceased get in the tub of hot water and in keeping the deceased there after permitting two older children to get out of the tub.

12. HOMICIDE—MANSLAUGHTER—EVIDENCE—PHOTOGRAPHS—LIMITING INSTRUCTION TO JURY—REQUESTED INSTRUCTION.

Photograph of a murder victim showing the extent of burns the victim suffered when the defendant put and kept her in a tub of hot water was properly admitted even without an instruction to the jury informing them of the purpose of the photograph where the defendant made no request for an instruction (GCR 1963, 516.2).

13. HOMICIDE — MANSLAUGHTER — CRIMINAL LAW — EVIDENCE — UNRELATED TESTIMONY — FAILURE TO STRIKE.

Failing to strike, as requested, testimony concerning blisters on the victim's feet, received several months before the victim's death as a result of hot-water burns and failing to advise the jury that this testimony was irrelevant to the manslaughter charge was not prejudicial error even though the prosecutor who had stated that he would connect the testimony to the manslaughter charged had failed to do so, where defense counsel did not renew his motion to strike the testimony, or make any request to charge, or voice any objections to the failure to charge regarding the testimony.

14. HOMICIDE—MANSLAUGHTER—EVIDENCE—SUFFICIENCY.

Verdict of manslaughter was justified where there was evidence that the defendant had the victim, the defendant's three-year-old stepdaughter, her twin sister and two older half-sisters

get into a tub of hot water, that all four girls screamed the water was too hot, the defendant spanked the two older girls when they insisted on getting out of the tub because the water was too hot, and the defendant kept the deceased and her twin in the tub while adding additional hot water and the deceased died from severe burns.

Appeal from Wayne, George T. Martin, J. Submitted Division 1 December 11, 1970, at Detroit. (Docket No. 7397.) Decided February 15, 1971.

Elizabeth J. Myers was convicted of manslaughter. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Patricia Pernick Boyle,* Assistant Prosecuting Attorney, for the people.

*Abba I. Friedman,* for defendant on appeal.

Before: DANHOF, P. J., and HOLBROOK and VAN-DER WAL,* JJ.

HOLBROOK, J. On April 1, 1968, the defendant was charged in a complaint and warrant with the crime of manslaughter, CL 1948, § 750.321 (Stat Ann 1954 Rev § 28.553). An examination was held April 26, 1968, and defendant was represented by Watts A. Shelly. The defendant was bound over to the circuit court for trial. An information[1] was

---

* Circuit judge, sitting on the Court of Appeals by assignment.
1 "Elizabeth J. Myers
"late of the City of Dearborn in said County, heretofore, to-wit, on the 29th day of March A.D. 1968 at the said City of Dearborn in said County, with force and arms, in and upon one Antoinette Myers, in the peace of the People of the State of Michigan then and there being wilfully, unlawfully and feloniously did make an

filed on May 23, 1968. On June 5, 1968, defendant was arraigned in circuit court with counsel present and stood mute, and a plea of not guilty was entered.

On June 26, 1968, Marvin Blake was substituted for Watts A. Shelly as attorney for the defendant.

The case was set for trial, first for July 8, then adjourned on June 26 to September 9, and on August 23 it was again adjourned to October 14, 1968. Trial before a jury was commenced on October 14 and completed on October 21, 1968 in the circuit court for the county of Wayne. The verdict of the jury was guilty as charged. A psychiatric examination was ordered by the court with 3 psychiatrists appointed. After their report and a pre-sentence report from the probation department had been received, the court, on January 30, 1969, sentenced defendant to a term of from 10 to 15 years in the Detroit House of Correction.

Upon proper application of defendant, appellate counsel was appointed for her on April 15, 1969, and the transcript ordered. On May 14, claim of appeal was filed and new counsel for defendant, Abba I. Friedman (present counsel) was appointed on January 13, 1970. On January 23, 1970, the trial transcript was filed in the trial court. Defendant's brief was filed on May 18, and plaintiff's brief on

---

assault, and the said Elizabeth J. Myers in and upon her, the said Antoinette Myers, did then and there inflict divers mortal wounds and injuries of which mortal wounds and injuries so inflicted, as aforesaid, the said Antionette Myers, from the 29th day of March, A.D. 1968, until the 31st day of March, A.D. 1968, in the University Hospital of Ann Arbor, City of Ann Arbor, County of Washtenaw, did languish, and at the Wayne County General Hospital, City of Westland, County of Wayne, did languish, and languishing did live; on which 31st day of March, A.D. 1968, the said Antoinette Myers, at the University Hospital of Ann Arbor, City of Ann Arbor, County of Washtenaw, of the said mortal wounds and injuries, so inflicted, as aforesaid, did die; wherefore, the said Elizabeth J. Myers, in manner and form aforesaid, the said Antoinette Myers, did wilfully, unlawfully and feloniously kill and slay; * * * ."

August 13, 1970. Defense counsel raises five issues on this appeal for our review and decision. We restate them as follows:

(1) Did the trial court err in refusing to quash the information because of lack of evidence at the examination?

(2) Was the defendant's attorney prejudicially restricted in stating to the jury his theory of the law in his opening statement?

(3) Did the trial court err in admitting a photograph of the deceased showing the extent of the burns on her body?

(4) Did the trial court err in failing to strike from the testimony the account of a prior burn on the deceased?

(5) Did the trial court err in refusing to grant a motion for directed verdict based on the claim that voluntary manslaughter had not been proven?

I

In the case of *People* v. *Ray* (1966), 2 Mich App 623, 627, 628, it is stated in part as follows:

"The first issue to be considered is the sufficiency of the evidence produced at the examination to warrant binding the defendant over for trial in the circuit court. The test, upon preliminary examination, is stated by Mr. Justice CARR in the case of *People* v. *Asta* (1953), 337 Mich 590, on p 609 as follows:

" 'Under the statute relating to preliminary examinations (CL 1948, § 766.13 [Stat Ann 1954 Rev § 28.931]) the magistrate may bind a defendant, or defendants, over to the circuit court for trial if it shall appear from the proofs that an offense not cognizable by a justice of the peace has been committed, and that there is probable cause for charging defendant, or defendants, therewith. In the in-

stant case it was not required that the justice find the guilt of the defendants established beyond a reasonable doubt. *People* v. *Hirschfield* (1935), 271 Mich 20, 27; *People* v. *Wilkin & Walsh* (1936), 276 Mich 679, 687. It was essential, however, under the provisions of the statute, to determine that the offense charged had been committed, and that there was probable cause to believe that defendants were guilty.'

"Gillespie in 1 Michigan Criminal Law and Procedure (2d ed), § 303, p 361, stated:

" 'All facts and incidents which plainly relate to the offense are admissible. In many cases the application of strict rules of evidence would go far to defeat the object of the inquiry. The examining magistrate must be allowed a large discretion as to the extent and range of the inquiry. The magistrate does not act judicially in the technical sense, and the proceeding is one which, at common law, was conducted very much at the discretion of the magistrate.' "[2]

In reviewing the testimony presented at the preliminary examination, we find the following pertinent facts:

On the fateful late afternoon or early evening of March 29, 1968, there were five persons present during part or all of the occurrence that led to the charge here. They were the defendant and four of her stepdaughters, Antoinette, the deceased, Theresa, Antoinette's identical twin, and two older sisters, Brenda and Frances. The defendant had placed or told the four girls to get in the tub. The water was hot and Brenda and Frances, after stating it was too hot, were told by defendant to get out of the tub and go to bed. The two littlest girls, Antoinette and Theresa, remained in the tub. Some time later, about 6:15 p.m., the defendant called on a neighbor

---

[2] *Hamilton* v. *People* (1874), 29 Mich 173.

for help because the twins were having trouble breathing. Kathryn Shelhart, the neighbor, went with defendant directly to the bathroom of defendant's home and there she saw the twins on the floor. She testified that they were moaning, making a little cry, and breathing rather oddly. Their eyes seemed to be staring, didn't seem to be focusing on anything as they moaned. She stated that they were horribly burned—both seemed to be evenly burned. She called the Dearborn rescue squad and awaited their arrival. When they arrived, Antoinette and Theresa were taken by them to the Wayne County General Hospital.

John Gorbe, a Dearborn police officer, testified that he arrived at the house shortly after 6 p.m. and in talking to one of the older children was informed that Brenda was upstairs in bed and that she had a cut on her leg. He went upstairs and found her leg was burned and he took her to the hospital. At the hospital he asked Brenda who turned the water on and she said her mother turned the water on and that the water was so hot she got out. Upon being informed by Brenda that Frances was also burned, the officer returned to the residence and finding that Frances was burned on the ankle, also took her to the hospital. The officer's testimony in part is as follows:

"*Q.* What did you do then, if anything?

"*A.* I talked to Frances on the way out to the hospital also.

"*Q.* What, if anything, did she say?

"*A.* Frances told me the same thing, her mother turned the water on, the water was real hot. She got out of the bathtub, she and Brenda got out of the bathtub, because her mother told them to. I asked them about the twins, and she said the twins did not get out of the bathtub, because the mother

did not tell them to, and her mother sent Frances and her, Brenda, to bed.

"*Q*. Did you stay at the hospital with the two girls?

"*A*. I was there a little while until the helicopter came.

"*Q*. Frances and Brenda, did you stay at the hospital with them?

"*A*. No, I didn't stay in the room with them.

"*Q*. How did they get back to their home, did you drive them back?

"*A*. No.

"*Q*. You were at the hospital when the helicopter came?

"*A*. Yes.

"*Q*. What helicopter was that?

"*A*. The helicopter that came to transport the twins to the Ann Arbor Hospital."

The resident physician at the Wayne County General Hospital, Charles Duane Adams, M.D., was a witness at the examination and testified in part as follows:

"*Q*. Did you have occasion to be called in regard to two little girls being burned?

"*A*. Yes.

"*Q*. How did you happen to be called?

"*A*. I was emergency room surgical physician at the time.

"*Q*. What, if anything, did you observe when the girls were brought in?

"*A*. They arrived at 6:32, by our record. My attention was directed to the first, two children, two twins.

"*Q*. Can you estimate the age at this time?

"*A*. I was told by, the records indicate three and a half, by the record room. They, I better describe one at a time. One of them was identified to me as Antoinette Marie Myers. She was very ill. She was lying rigidly on the stretcher. She had cyanosis

around the mouth, or she was bluish color. She was bluish in color. She had a very shallow respiration. Well, from all appearances, she appeared morbid, she appeared to be near death. She was burned from the waist down.

\*     \*     \*

"*A.* Well, her left foot was in extension, the toe was pointed down. We attempted to straighten the feet up. When we attempted to straighten the foot up, it would not return to the normal position. I interpreted that to being that she had sufficient burning to, well, to have caused shortening of the Achilles' tendon, and caused her foot to be permanently short, She had no sensation to the entire lower extremeties, except for the few spots on the upper portion of her foot.

\*     \*     \*

"*A.* She had no sensation except on the dorsum of her foot. As far as the rest of her examination, she had a rapid pulse. I started administering oxygen at this time because of her color. I made an incision in her right arm to find a vein so I could have fluid enter by vein, which took a period of time, approximately five minutes. We drew blood from here for typing and cross match, so we could administer blood, if necessary. We drew blood for chemical studies. She did not respond to therapy. That is, her blood pressure did not return to normal. Her pulse did not improve with the considerable amount of fluid. The extent of her burn was approximately 55%, as I estimated it.

"*Q.* Doctor, what does 55% mean?

"*A.* Of her total body surface.

\*     \*     \*

"*Q.* Were both legs completely burned?

"*A.* That is correct. Because of the extent of her burn, we felt it advisable, and it is our policy in these burn cases, if possible, to take them to the University of Michigan Hospital, where they specialize in the treatment of extensive burns. I called the U

of M Hospital, University Hospital, and asked to transfer, and I received permission to do that. Then, I called the ambulance to have her transferred to the U of M Hospital. During the time that she was in our care she never responded to our therapy of fluid. We felt this was unusual, and perhaps pointed to some other disturbance beside the burn.

\*      \*      \*

"*Q.* Did you ask questions?

"*A.* Yes, how she felt, and I asked her, I forget all the questions I asked her, but I asked several times. I would have to speak loudly and repeat the question, in other words, to get a response, and then it was a very minimal response. In addition to these findings, I noticed that she had a contusion on her right cheek.

"*Q.* Describe the contusion, doctor.

"*A.* Well, it was small, I would say it was about a half inch in diameter, below the right eye, and a little bit to the right of the right eye. There was also a conjunctival hemorrhage.

"*Q.* What is that?

"*A.* Conjunctival, this is blood beneath the lining of the white part of the eye. It looks like a blood blister underneath the white of the eye, on her right eye. I assumed this to be due to trauma, trauma that caused the contusion on the right cheek just close to that point.

"*Q.* Doctor, could you determine how long the contusion had been on the girl's cheek, or how recent in time it was?

"*A.* The contusion was dark blue in color, and I suspected several hours old, because initially, for some period of time, they appeared to be red, and they become more darkened, this is a bruise, what I am talking about, a contusion. She was given fluids, and she was transferred in a critical condition to the University Hospital.

\*      \*      \*

"*Q.* Doctor, you stated that you had the child for approximately how long under your observation?

"*A.* She was there for an hour and a half.

"*Q.* An hour and a half?

"*A.* Yes."

Dr. Thomas Mehalic of the U of M Hospital, assigned to the burn unit, was a witness and he testified in part as follows:

"*Q.* On that day doctor, did you see or did you have occasion to see a Antoinette Myers?

"*A.* Yes, sir.

"*Q.* When did you see her?

"*A.* At approximately 9 p.m. that evening.

"*Q.* Where?

"*A.* In the Burn Unit.

"*Q.* What, if anything, did you observe?

"*A.* Upon admission, she was carried on a stretcher, along with her twin sister. I immediately looked at both of them and directed my attention toward Antoinette, because she seemed to be in more distress.

"*Q.* What do you mean 'more distress', will you describe that at this time, doctor?

"*A.* She seemed to be having trouble with breathing. She was blue around the mouth. Her fingertips were blue. She seemed to be struggling for air.

"*Q.* What then did you do, if anything?

"*A.* We immediately started oxygen, continued to watch her very closely, and through the course or over the next, I would estimate fifteen minutes, proceeded to give respiratory stimulance, because she did not seem to respond to the oxygen. Along with this we injected fluids intravenously. She responded quite well.

"*Q.* How long did you stay with the patient, doctor?

"*A.* That evening, is that what you are asking?

"*Q*. Yes, did you stay continually?

"*A*. I was with the patient the entire night, or in the Burn Unit, directing my attention to both of them.

"*Q*. The night of the 29th and morning of April 30th?

"*A*. March 30th.

"*Q*. I am sorry, March the 30th?

"*A*. Yes, sir.

"*Q*. How about the morning of March 30th?

"*A*. Yes.

"*Q*. You were with the patient then too?

"*A*. Yes, sir, I was in the room in the back, close to them, wasn't with them at all times.

"*Q*. What do you mean 'them.'

"*A*. The twins.

"*Q*. How long did you attend Antoinette Myers?

"*A*. Until she passed away.

"*Q*. When was that?

"*A*. Sunday morning, at approximately 9:15 a.m.

"*Q*. That would be March 30th?

"*A*. 31st, I believe.

"*Q*. March the 31st. Were you with the patient all that time from the 29th to the 31st?

"*A*. Within five minutes, I could be with the patient. I was in the hospital that entire time.

"*Q*. On March the 31st, you were with the patient at 9:15 a.m.?

"*A*. Yes, sir.

"*Q*. Did you determine the patient was dead?

"*A*. Myself, along with Dr. Fellor [*phonetic*], who is the head of the Burn Unit.

"*Q*. At that time did you determine the cause of death?

"*A*. Well, the primary cause of death, of course, would seem to be the burn instrument itself, but whatever at that particular moment caused her demise remained unknown to us. You must remember the burn itself was the initial injury and would predispose to whatever caused her medical death.

\* \* \*

"*Q.* Did you have an opportunity to talk to Theresa?

"*A.* Yes, I did.

*        *        *

"*Q.* What, if anything, did Theresa say as to how she received the injury?

"*A.* She said that they were in the bathtub.

"*Q.* Who is 'They.'

"*A.* Antoinette, and there were apparently some other children. I don't know who else was in the tub, but someone else, and that the other two children, who apparently were older, because in asking the family history, I knew they were the youngest in the family, got out of the bathtub. I asked them why they remained in the bathtub, and she said that mother turned the water on again, and that is the extent of my conversation regarding that.

*        *        *

"*Q.* Did you notice the injury on the cheek?

"*A.* Yes, sir.

"*Q.* Did you make any conclusions on that?

"*A.* Insofar as the injury itself, I estimated it to be a bruise.

"*Q.* A bruise?

"*A.* Yes, sir.

"*Q.* Did you question Theresa relative to the withdrawal of her two sisters, Frances and Brenda?

"*A.* A withdrawal?

"*Q.* Withdrawal from the bathroom.

"*A.* The only question I asked, I said, 'How did the other two get out; why did the other two get out?' She said they got out of the tub and left.

"*Q.* She didn't review how, she just said got out and left?

"*A.* She said, it was the older sister that said that it was too hot and they were going to get out. They got out and left, then the mother—I asked why didn't you get out, and they said the mother came in and turned on the water again. That is all I know. That is all I asked specifically regarding that."

Dr. Ronald Nishiyama, associate pathologist at the U of M Hospital, was a witness and testified in part as follows:

"*Q.* Did you have occasion on March the 31st, 1968, did you have an opportunity to examine Antoinette Marie Myers?

"*A.* Yes.

                    *        *        *

"*Q.* What was the purpose of your examination?

"*A.* The purpose of my examination was to determine the cause of death.

                    *        *        *

"*Q.* Is there any other way to determine the cause?

"*A.* Chemical means.

"*Q.* Did you use any other means in this case?

"*A.* We did take a blood culture, did examine for bacteria and this was positive.

"*Q.* What does that mean?

"*A.* The patient, before her death, my conclusion is that the patient, before her death, had bacteria circulating in her blood.

"*Q.* Could that cause death, doctor?

"*A.* Yes, that could cause death.

"*Q.* Did you examine the patient?

"*A.* Examine the patient physically?

"*Q.* Yes.

"*A.* Yes.

"*Q.* What was the result of your examination?

"*A.* The result of the examination, the findings were the brownish discoloration of the skin, which involved both her lower extremities, involved the abdomen three centimeters above the umbilicus, that is the navel; that is from the observation, the conclusions, that these were burned, and the other findings, she did have ecchymosis, or the other term, a bruise on her right cheek. There was another bruise found above her eyebrow, and in examination of her head, she had small bruises on both sides of the head. The other findings included, the same as

the medical chart indicated, that the child did suffer from convulsions. Our attention was directed toward the head, possibility of finding a brain injury and evidence of brain injury was present. This was a small subdural hemorrhage on the left side of the patient. The brain was edematous, that is swollen, and the other findings were on the skin of her neck, these were not visible externally, but on reflection of the skin around the neck, there was a collection of blood on both sides of her neck. This is clotted blood, and as far as the external examination, that is the extent of what I observed.

\*     \*     \*

"*Q.* Just a few questions we should clear up now, doctor. The blood clot or condition is underneath the skin, is that around the neck?

"*A.* This was on either side of the larynx, which is the voice box.

"*Q.* Could you determine the cause of the clot, doctor?

"*A.* Well, the cause of the clot could be external pressure applied around the neck.

"*Q.* What else could it be?

"*A.* I think that would be the only logical—or hyper-extension of her neck.

"*Q.* Now, you stated that one of the causes was bacteria in the blood, did you determine how that got in the blood?

"*A.* The organism is, *Pseudomonas aeruginosa.* Now, this is a bacteria often found in burned patients, either on the surface of the skin or circulating in their blood, and many times the primary cause of death.

"*Q.* It can cause death?

"*A.* Yes, sir.

\*     \*     \*

"*Mr. Baydarian* [*assistant prosecutor*]: Could the bacteria in Antoinette Myers have been caused by the bruise on her neck?

"*The Witness:* That is highly unlikely.

"*Mr. Baydarian:* How about the blood under and around the neck?

"*The Witness:* I would say that is highly unlikely."

The magistrate upon finding that the defendant had turned on the hot water for the tub, had placed or requested the deceased to get in the tub, that the two older children said it was too hot, that they were allowed to get out and go to bed, and that thereafter the defendant turned on additional hot water and the twins were burned from this water to the extent of second- and third-degree burns covering 55 percent of the deceased's body, with or without the findings of a contusion of the deceased's cheek caused at about the same time of the burning and of blood clotting on the deceased's neck which indicated something being placed around her neck, was justified in binding the defendant over to the circuit court on the charge of manslaughter. Also, the evidence of an assault, *i.e.*, the hot water being applied to the body of Antoinette together with evidence of trauma to her cheek and neck resulting in her death, were sufficient facts for the magistrate to find probable cause to charge defendant with the offense. In 3 Gillespie, Michigan Criminal Law and Procedure (2d ed), § 1658, pp 2001, 2002, it is stated as follows:

"Our statutes provide a punishment for but do not define manslaughter, and have left it as at common law.[3] Manslaughter is defined as the unlawful killing of another without malice, express or implied.[4]

---

[3] CL 1948, § 750.321 (Stat Ann 1954 Rev § 28.553). *People* v. *Stubenvoll* (1886), 62 Mich 329.

[4] *Maher* v. *People* (1862), 10 Mich 212 (81 Am Dec 781); *People* v. *Droste* (1910), 160 Mich 66; *People* v. *Onesto* (1918), 203 Mich 490.

"Manslaughter, when voluntary, arises from a sudden heat of passion, without malice or premeditation, and as the result of temporary excitement by which the control of reason was disturbed, rather than from any wickedness of heart of cruelty or reckless disposition."[5]

Now it is true that defendant could have been charged with a more serious crime; however, defendant cannot complain because no prejudice resulted to her. *People* v. *Collins* (1968), 380 Mich 131, 135.

*Arguendo,* notwithstanding the fact that defendant was successful in having the trial judge rule that involuntary manslaughter couldn't be considered by the jury under the information filed, we conclude that manslaughter by *assault* may be charged under the statutory short form and may constitute involuntary manslaughter. This rule is specifically set forth in the case of *People* v. *Rogulski* (1914), 181 Mich 481. Defendant Rogulski was charged under the short-form information, was convicted of involuntary manslaughter, and on appeal claimed that he could not be convicted of involuntary manslaughter on a bare allegation that he had killed another by assault.

The Court affirmed the conviction, stating at 494, 495:

"Our statutes do not recognize grades or degrees of manslaughter, they neither define nor grade it. There is but one offense of manslaughter in this State. * * * While in the discussion of that offense voluntary and involuntary manslaughter are often reviewed and the distinctions pointed out for a better understanding of what homicide may amount to manslaughter, and the formal charge and

---

[5] *People* v. *Lilley* (1880), 43 Mich 521; *People* v. *Lilly* (1878), 38 Mich 270.

conviction, there is no legal classification or distinction in this State.    \*   \*   \*

"It has been held in only a special class of statutory offenses involving consequential homicide, not directly resulting from assaults or acts of violence \*   \*   \* that the peculiar facts of the offense must be more fully charged than in the statutory information.   \*   \*   \* [H]e can be 'fairly assumed bound to prepare himself to meet a charge of manslaughter by direct violence or assault.' "

*Rogulski* thus establishes that a charge of death from assault is sufficient to charge involuntary manslaughter, and that there is no distinction between voluntary and involuntary manslaughter in Michigan for any purpose except that of the pleading of negligent and statutory homicide.   See also, *People v. Stubenvoll* (1886), 62 Mich 329, 339; 89 ALR2d 396, § 18, p 439.

## II

The defendant maintains that her counsel was prejudicially restricted in stating his theory of the law to the jury in his opening statement.   The defendant's position on the law, that the information charged voluntary manslaughter and that the people could not present to the jury its theory that defendant was guilty of involuntary manslaughter, was sustained by the court at the beginning of the trial.   The defendant's attorney stated in his opening statement after reading the information:

"Manslaughter, the type with which she is charged here, is the intentional killing of another in the heat of passion—"

There was an objection and the court finally said:

"Very well.   You have argued the point and the court will rule in this fashion: That you are not to

tell the jury what the law is, Mr. Blake, in your opening statement, although you may say what you are going to prove or what the prosecution cannot prove in the way of intent."

The defendant's counsel then argued intent, voluntary manslaughter, and ended his statement with the following:

"In short, the issue is, as I see it, and which I argue and which I state to you now, that while the prosecutor charges an intentional killing, it is our theory of the case that this was, one: either accidental from which no fault should be found, or, that it was occasioned, possibly, by the defendant's negligence, which negligence is not the charge before you.

"If you find at the conclusion of all the proofs that the defense theory of the case is correct, and if you have a reasonable doubt, merely a reasonable doubt, of the prosecution's theory, that would be enough for you then to come in and tell the court that the defendant is not guilty of an intentional killing. That she is not guilty of the voluntary manslaughter with which she is here charged.

"Members of the jury, I ask of you that while you have been told already, and you will be told again, that you are to consider this case upon the facts presented and upon your interpretation of those facts without recourse to sympathy for the defendant or pity for her in the situation in which she finds herself, I ask you only that you very carefully listen to the facts as they are brought before you so that you may, in a very fair and impartial way, determine whether this was an intentional killing as charged, or on the other hand, a negligent happening, or pure accident.

"And I will ask you that if you find that it was accident or negligence, that you therefore, pursuant to the charge of the court that he will give you at the conclusion of the trial, bring in a verdict of not guilty. Thank you."

The ruling that defendant's counsel could not argue his theory of the law in the opening statement was error. *People* v. *Smith* (1913), 177 Mich 358; *People* v. *Lee* (1932), 258 Mich 618. However, he did in effect state his theory of the law—that intent was required to be proven, that defendant did not intend to cause death, and that the death was an accident or at most negligence, which was not charged. In view of the fact that the trial judge instructed on the law in accordance with defendant's position and because this Court determines that there has not been a miscarriage of justice in this case, we do not determine the ruling to be reversible error. CL 1948, § 769.26 (Stat Ann 1954 Rev § 28.1096).

## III

The defendant claims that the photograph of the victim should not have been admitted because it was (a) inflammatory; (b) unnecessary because alternative means existed to establish deceased's identity; and (c) admitted without instructions as to the purposes for admission.

Photographic evidence relative to a material point may be inadmissible if its possible prejudicial effect outweighs its probative value. Gruesomeness alone does not render photographs inadmissible. *People* v. *Turner* (1969), 17 Mich App 123, 130; 73 ALR2d 769.

The admissibility of photographs is for the sound discretion of the trial court. *Anderson* v. *Lippes* (1969), 18 Mich App 281. Where objection is made to the introduction of inflammatory photographs, the trial court abuses its discretion in admitting the evidence without requiring the people to lay a predicate that the issue or issues to be proven could not be effectively proven with evidence less potentially

prejudicial. *People* v. *Brannon* (1968), 14 Mich App 690.

(a) After viewing the one photograph admitted, we conclude that it was not gruesome. It could well be sympathy-producing but not inflammatory, repulsive, horrifying, or anger producing. (b) The photograph had definite probative value to show defendant's intent and the deceased's identity. The extent of the burns on the body of the deceased was relevant to defendant's intent in placing the child in the tub and keeping her there after the older children were allowed to get out of the tub. It was also necessary as a means to identify the deceased. The twins were identical and a view of the face alone could not be used to identify the deceased. Only after each doctor had testified that he could not distinguish Antoinette from her sister without a photograph and after each was recalled, shown the proposed exhibit and asked if he could identify the deceased from the photograph did the court permit the photograph to be introduced. The deciding factor of this particular photograph was that it showed the left knee of Antoinette was spared and not burned, whereas both of Theresa's knees had been burned.

In the absence of a request for an instruction informing the jury for what purposes the exhibit was admitted or an objection to the instructions as given in accordance with GCR 1963, 516.2, we determine there was no error. Defendant could very well have reasoned that an instruction as to the use for which the photograph could be considered by the jury would emphasize the importance of the photograph to prove intent and identity and, therefore, omitted a request for an instruction as a trial tactic. There is no prejudicial error as to issue III.

IV

Defendant claims error concerning the prosecutor's questioning of the husband of defendant in the manner following:

"*Q.* You did see your daughter, Antoinette, did you not?

"*A.* At Wayne County?

"*Q.* Yes.

"*A.* Yes.

"*Q.* And did you see her at the Ann Arbor University Hospital at Ann Arbor also?

"*A.* Yes.

"*Q.* Do you know whether or not your daughter had ever suffered from burns previous to March 29, 1968?

"*A.* As burns? What kind are you talking about?

"*Q.* Burns to the skin, of some sort.

"*A.* I have known of blisters on her feet, yes.

"*Q.* I see. And approximately when—this is Antoinette I'm speaking of?

"*A.* That's right.

"*Q.* When did this take place?

"*A.* In December.

"*Q.* Is that December of 1967?

"*A.* Yes.

"*Q.* Did she receive medication for this?

"*A.* Yes.

"*Q.* Was this medication through a medical doctor?

"*A.* Yes.

"*Q.* Do you know the doctor's name?

"*A.* Yes.

"*Q.* What is that?

"*A.* Doctor Heck.

"*Q.* Dr. Heck?

"*A.* Yes.

"*Q.* Do you know how these burns or these blisters were received by Antoinette?

"*A.* No, I do not.

"*Q.* Were these burns or blisters ever—did—were they received in your presence or not? Did you see Antoinette get burned or blistered?

"*A.* No, I did not."

No objections were made to any of this testimony. Defendant's counsel did later on state as follows:

"*Mr. Blake:* Your Honor, the charge contained in the information is voluntary manslaughter. Under the law of our State, that requires a criminal felonious intent. I believe that that question that was asked by Mr. Hayes of the witness concerning a prior burn was unfortunate, because I think it was not only irrelevant to the charge, unless it could be shown that that was the result of an intentional injury to the child, caused by my client, but it also, unless that could be shown, is in violation of the law in relation to Michigan Statutes Annotated 28.1050.

"I think it was irrelevant to the matter and I think it could not be upheld under any interpretation of 28.1050, and I cite to the Court *People* v. *Askar* [1967], 8 Mich App 95, and I think it was incumbent upon the prosecutor to know that—if he couldn't show that it was an intentionally-inflicted wound on that child, of the same sort—it was incumbent upon him not to ask the question.

"Now, I ask the court's indulgence and understanding in this: that I did not object at the time because an objection on my part would only compound the situation. It would only make it seem that I was trying to hide evidence from the minds of the jurors, but I felt that under the circumstances, a warning of sorts having been given to the prosecutor, it was better, all in all, that I would hold my objection until such time as the jury left this court.

"Now, that burn or blister, or whatever it was, was, according to my client, diagnosed to him [*sic*] as a possible chemical wound of some sort—a chemical burn—having no connection with this sort of thing—and there was no showing and there will be

no showing, I am confident, that was inflicted in an intentional way. As such, it should not have been asked.

"I ask for an admonition to the prosecutor. Whatever the court can do, I am afraid that if there is any ruling that I ask for—that it be stricken— well, I'd like time to think about that. I'm not sure if that makes matters worse or not.

\*     \*     \*

"*The Court:* What are you asking for, Mr. Blake?

"*Mr. Blake:* I don't know yet, your Honor. I just don't know.

"*The Court:* We'll take it under advisement, then.

"*Mr. Blake:* Perhaps an admonition to the jury that that being a chemical wound, not in any way related, was completely irrelevant, and shows nothing and should be entirely disregarded, I suppose, might be helpful. I guess it can't be helped. I don't know."

Still later in the trial, defendant's attorney asked the court to strike the testimony and to advise the jury that it was irrelevant. Thereupon the prosecuting attorney said he would connect it up later on. The prosecuting attorney did not connect the testimony later on nor did defendant's attorney make any further motion. Under these circumstances prejudicial error was not committed; defendant's attorney having failed to renew his motion to strike or to make any request to charge or to object to the failure to charge, counsel has not preserved his claim of error in this regard. *Arnold* v. *Ellis* (1966), 5 Mich App 101, 113; *People* v. *Qualls* (1968), 9 Mich App 689; *People* v. *Anderson* (1968), 13 Mich App 247. Furthermore, this testimony was not connected to defendant in any manner.

Another question concerning a burn unrelated to the burn, the subject of this case, was asked and the court sustained defendant's objection thereto.

We conclude there was no prejudicial error as to issue IV.

### V

Defendant maintains that the people failed to present sufficient evidence to justify the jury's finding defendant guilty of manslaughter beyond a reasonable doubt.

Defendant argues that the case was submitted to the jury on a charge of involuntary manslaughter. This is not true for the court required the people to prove voluntary manslaughter. We point out that the matter was discussed in issue I and what we there said is applicable here. We reiterate that where an information for manslaughter alleges death resulting from an assault, it is proper for the court to instruct on involuntary manslaughter. *People* v. *Rogulski, supra,* and *People* v. *Collins* (1942), 303 Mich 34. This error of the trial court was initiated by the defendant and benefited the defendant by imposing a greater burden of proof on the people and thus may not be assigned as error here.

The evidence produced at the trial included in substance that presented at the preliminary examination together with corroborative and other testimony. Some of the additional testimony was to the effect that all four girls screamed that the water was too hot. The older girls, Brenda and Frances, were given "lickings" by defendant when they insisted on getting out of the tub the second time. The witnesses at the examination also testified at the trial. Among the additional witnesses who testified were four older sisters of the deceased, Margaret, Sarah, Brenda and Frances; Leonard Myers, their father; Jocelyn Thomson, a registered nurse; Beverly Russell, a student nurse who went to defendant's home shortly after the occurrence to give

help; several City of Dearborn police officers; and Leroy Papke, fire captain of the Dearborn Fire Department.

After a careful review of the evidence produced at the trial, we conclude that there was sufficient evidence, including circumstantial evidence, presented, which, if believed by the jury, justified the verdict of guilty of manslaughter beyond a reasonable doubt.

Affirmed.

All concurred.